UNITED STATES of America, Plaintiff-Appellee,

v.

Louis Lee HYDE, Joseph Burtis Middlebrooks, Jr., Patricia Jean Middlebrooks, and Pedro Rocha Arenas, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

Joseph Burtis MIDDLEBROOKS, Patricia Jean Middlebrooks, and Pedro Rocha Arenas, Defendants-Appellants.

Nos. 77–5482, 77–5489.

United States Court of Appeals, Fifth Circuit.

June 9, 1978.

Rehearing and Rehearing En Banc Denied Aug. 14, 1978.

Michael B. Mann, Lynn Haven, Fla. (Court-Appointed), for Joseph and Patricia Middlebrooks.

Franklin R. Harrison, Panama City, Fla. (Court-Appointed), for Louis Lee Hyde.

G. Rudolph Garza, Jr., Corpus Christi, Tex., Pedro Rocha Arenas, pro se, for Pedro Rocha Arenas.

Nickolas P. Geeker, U. S. Atty., Pensacola, Fla., Donald S. Modesitt, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before COWEN *, Senior Judge, GOLDBERG and AINSWORTH, Circuit Judges.

COWEN, Senior Judge:

Louis Lee Hyde, Joseph Middlebrooks, Jr., Patricia Middlebrooks, and Pedro Arenas appeal from convictions on drug charges in the United States District Court for the Northern District of Florida. The defendants were indicted for conspiracy to possess, with intent to distribute, marijuana and cocaine, and for possession of, with intent to distribute, marijuana and cocaine, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 18 U.S.C. § 2. A jury found them guilty on all counts. Several issues are raised on appeal, including the validity of a wiretap order, a warrantless search and arrest, and denial of due process in the conduct of the trial. We find no error in the proceedings below, and we affirm the convictions.

In 1974, agents of the Florida Department of Criminal Law Enforcement (FDCLE) began to investigate drug traffic

* Senior Judge of the Court of Claims, sitting by designation.

in the area of Panama City, Florida. They soon learned of a widespread conspiracy whose members smuggled marijuana and cocaine from Mexico across the border into Texas and distributed it to various cities throughout the South, including Panama City. The defendants in this case were suspected of participation in the conspiracy. Several attempts were made to gather incriminating evidence against the conspirators, but none resulted in a conviction.

On February 14, 1977, Special Agent Clarence S. Rowell of the FDCLE applied to Justice James C. Adkins of the Supreme Court of Florida for an order authorizing the interception of wire communications under the provisions of Florida Statutes section 934. The telephone line sought to be "tapped" was number (904) 265–5833, registered to Debbie Yarbrough, the stepdaughter of Mr. Hyde. On February 15, 1977, Justice Adkins issued an order authorizing interception of communications pertaining to narcotics traffic on that telephone line for 30 days.

State officers intercepted and recorded many such communications between February 15, 1977, and March 15, 1977. The defendants discussed marijuana and cocaine transactions over the phone. The tape recordings of those conversations were admitted into evidence at the trial; witnesses positively identified the voices of all four defendants.

Information obtained from this wiretap was passed on to law enforcement officers in several parts of the country. In particular, narcotics agents in McAllen, Texas, a border city near Brownsville where it was thought narcotics were entering the country, were kept informed of the activities of the conspirators, and several suspects were kept under surveillance in Texas. Information discovered by the Texas agents concerning the movements of the suspects, their presence in or absence from Texas, and their meetings with each other checked with information obtained through the wiretap.

Towards the end of the 30-day wiretap period, the monitoring agents learned that Mr. Middlebrooks was in Austin, Texas, to consummate a narcotics transaction that was to take place between March 14 and March 16, 1977. Mr. Arenas was to drive Mr. Middlebrooks' car from Austin to McAllen, pick up a quantity of marijuana, and return the car to Mr. Middlebrooks.[1] The agents knew all the details of the transaction except its exact date and time and the place where the car was to be returned to Mr. Middlebrooks.

Agents in Texas went to Mr. Arenas' apartment in McAllen, where they observed Mr. Middlebrooks' car parked outside. Two men left the apartment; one entered Mr. Middlebrooks' car and one entered Mr. Arenas' car. Both vehicles left McAllen, heading north towards the border checkpoint. The agents followed. Over citizens' band radio they heard the defendants say that there were no state police in the area and that the border checkpoint was closed. The agents followed the two cars to Houston, Texas, where the two drivers met Mr. Arenas. Mr. Arenas began driving the Middlebrooks car, while the other two men followed in Mr. Arenas' own car. Both cars drove to a Ramada Inn in Corpus Christi, Texas, where Mr. Arenas parked Mr. Middlebrooks' car and entered room 326. The other two men waited in Mr. Arenas' car.

Mr. Arenas emerged from the apartment shortly thereafter and joined the other two men in his car. As they prepared to leave, they were arrested. Mrs. Middlebrooks, coming out of room 326, saw the arrests and ran back into the motel room. Agents rushed to the room, knocked, and identified themselves. They received no answer and forced the door. The noise of a commode flushing was heard; Mr. Middlebrooks was immediately apprehended in the bathroom. Mrs. Middlebrooks was arrested in the living room. The agents found and seized cocaine paraphernalia. They also obtained

1. Since McAllen is a border town, the border checkpoint is outside the city limits, between McAllen and Austin.

the keys to the Middlebrooks' car and found 217 pounds of marijuana in the trunk. Mr. Hyde and several other members of the conspiracy were arrested shortly thereafter.

## I. *The Wiretap Order*

The issues generated by the wiretap order were argued strenuously by the parties, and deserve the greatest part of our attention in this opinion. The defendants [2] have contended that there was no probable cause justifying the issuance of the order; that the information contained in the affidavit supporting the request for an order was stale; that the affidavit contained misrepresentations; and that the affidavit failed to demonstrate that other investigative procedures had failed or would be unlikely to succeed.[3]

█ 1. *Probable Cause.* The most serious attack on the wiretap order in this case is that the affidavit submitted in support of the application was insufficient as a matter of law to give rise to probable cause. An order authorizing a wiretap, like an ordinary search warrant, must of course be supported by probable cause found by a magistrate. In examining this order, we are guided by a relatively strict standard of review.

In issuing a search warrant the magistrate must exercise his own judgment as to whether the facts alleged in the affidavit constitute probable cause for issuance of the warrant, he must act on the entire picture disclosed to him, he is entitled to use his common sense, and the courts have gone so far as to say that when this is done his determination is conclusive in the absence of arbitrariness   *   *   *. [*Bastida v. Henderson*, 487 F.2d 860, 863 (5th Cir. 1973).]

Where, as here, much of the information contained in the supporting affidavit comes from confidential informants, the magistrate's search for probable cause must be guided by and measured against the familiar standards set forth in *Aguilar v. State of Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Under those standards, the magistrate must be told of the underlying circumstances and particular facts which support the confidential informant's conclusions, and he must also be told why the informant should be considered reliable. The application for the order is insufficient if either of these tests is unmet.

█ The first test is plainly satisfied here. A drug smuggling conspiracy of wide scope and long standing is described in some detail, and it is alleged that the telephone sought to be tapped was used in furtherance of the conspiracy. Some of the defendants argue that their own connection with the conspiracy is insufficiently set forth in the application, but we have never required that a defendant be named in a wiretap application or accused of using the suspected telephone before evidence obtained by the wiretap can be used against him. One of the objects of wiretapping is to ascertain the full extent of participation in criminal activity, and we need not limit retrospectively the pool of potential defendants.

The second test is more difficult to satisfy. The affidavit itself states only that the confidential informants are "believed to be reliable" without giving any reason or support for this belief. The defendants make much of this apparent lack of evidence of reliability and urge that we strike down the order on this basis. If this were all we had to go on, we should probably have to agree.

---

2. We assume without deciding that all the defendants have standing to challenge the wiretap order, implying by this assumption no opinion on the subject. *See United States v. Scasino*, 513 F.2d 47 (5th Cir. 1975); *United States v. Poeta*, 455 F.2d 117 (2d Cir. 1972), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972).

3. It is settled law, contrary to the contention of one defendant, that judicially supervised wiretaps under this statute are constitutional. *United States v. Sklaroff*, 506 F.2d 837, 840 (5th Cir. 1975), *cert. denied* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975); *cf. United States v. U. S. District Court*, 407 U.S. 297, 314–22, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

■ But we are not constrained to rely solely on these bald assertions in our search for probable cause. Probable cause is to be gleaned from a "common-sense reading of the entire affidavit," *Spinelli v. United States, supra,* at 415, 89 S.Ct. at 588, informed by indices of reliability that courts have traditionally found worthy of respect. Examining the application as a whole, we find that a magistrate could reasonably conclude that the confidential informants were reliable and that probable cause was therefore established.

■ Several of the traditional tokens of reliability are present here. The information supplied in the 29-page affidavit is extremely detailed, suggesting that those who supplied it had firsthand knowledge of the events described. If the description of the criminal activity is "in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld," *Spinelli v. United States, supra,* at 416, 89 S.Ct. at 589, the magistrate may permissibly infer reliability. This affidavit supplies many details of the dates and locations of narcotics transactions, the parties to several criminal telephone calls, and the locations and movements of members of the conspiracy.

■ Second, some of the information supplied by the confidential informants was verified by independent police investigation. The informants stated that members of the conspiracy talked over the telephone often, and phone company records subpoenaed by investigators confirmed that telephone traffic between phones used by conspirators was heavy. Sources described certain conspirators as suppliers, and attempts to purchase narcotics from those persons confirmed the fact. Finally, the details of at least one narcotics transaction were described by one of the informants, and subsequent observation by law enforcement agents demonstrated that the actions of the conspirators corresponded with the information that had been provided by the source in advance.[4]

■ Third, one of the confidential informants, Nolan O'Quinn, was acting against penal interest in informing the police of his activities in the conspiracy. He is, in fact, a defendant in another prosecution stemming from this same conspiracy. It also appears that at least one other informant, Wilbur Sunday, revealed some degree of criminal involvement in the narcotics traffic. The defendants argue that the statements supposedly made against penal interest here did not *establish* the criminal liability of the speakers, but the penal interest rule is not so circumscribed. Federal Rule of Evidence 804(b)(3), which declares such statements admissible in spite of the hearsay rule (thus acknowledging their reliability), requires only that the statement *tend* to subject the speaker to criminal liability. An admission that one has been involved in a complex drug conspiracy is a statement that satisfies this requirement.

■ These traditional standards, then, all give the affidavit some degree of reliability, buttressing a finding of probable cause therefrom. But we think that another feature of the allegations is the strongest argument in favor of the reliability of the confidential informants. Ten such informants supplied information which appears in the affidavit—ten informants who were apparently independent of each other and who had no special reason to cooperate or collaborate. Yet the information supplied by these persons was mutually reinforcing and corroborative. Even though, as admitted by investigators at the suppression hearing, none of these sources was independently completely reliable, when the detailed information supplied by each of ten informants agrees in so many particulars with that supplied by the others, probable cause may be inferred. When three unreliable but unconnected persons all report the same fact, it is probable that the fact is true.

Because this basis for finding probable cause is novel in the field of search war-

4. See paragraph 5(d) of the affidavit.

rants supported by confidential informants' information, we set out in some detail the degree of agreement among the various sources. There were ten confidential informants: Lottie Calhoun, Nolan O'Quinn, six sources numbered 1–6 in the affidavit, and two unnumbered sources to which we assign number 7 (an anonymous female telephone caller mentioned in paragraph 5(b) of the affidavit) and number 8 (a confidential informant contacted by Detective Griffin and mentioned in paragraph 5(g) of the affidavit). An examination of the affidavit reveals the following facts:

(1) Number 1, number 2 and number 4 all reported that one Descel Eldridge was an important distributor of marijuana and cocaine in Texas.

(2) O'Quinn, number 2, number 4, number 5 and number 6 all reported that Mr. Eldridge and Mr. Middlebrooks were regularly smuggling narcotics from Texas to Florida. Several of the sources mentioned Panama City as the Florida destination.

(3) On one occasion, number 1 and number 7 both reported that Mr. Eldridge was in Texas to pick up marijuana to be delivered to Panama City.

(4) Calhoun and O'Quinn both reported that Calhoun had obtained a particular quantity of marijuana from Mr. Middlebrooks.

(5) Calhoun, O'Quinn, and number 3 all reported that Mr. Hyde had marijuana for sale.

(6) Calhoun and O'Quinn both reported that Mr. Hyde obtained his marijuana from Mr. Middlebrooks.

(7) Number 3 and number 4 both reported that Mr. Hyde regularly called Eldridge on his stepdaughter's telephone, (904) 265–5833, the subject of the wiretap application.

(8) Number 3 and number 4 both reported that Mr. Hyde used cocaine.

■ It can readily be seen that these independent sources tell a mutually corroborating story. The extent of their internal agreement lends credibility to the statements of each. We hold that this agreement, taken together with the other indices of reliability already present, demonstrates to the magistrate a reasonable basis to believe that the confidential sources are reliable. The second test of *Aguilar* is therefore satisfied, and probable cause for the issuance of the wiretap order existed.

■ *2. Staleness.* It is a fundamental principle of search and seizure law that the information given to the magistrate in the application for a search warrant must be timely. Probable cause must be found to exist at the time the warrant issues.

* * * the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case. * * * [*Sgro v. United States*, 287 U.S. 206, 210–11, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932).]

Defendants here argue that this requirement was not met.

■ There is some confusion over whether the timeliness of the application is to be judged from the most recent act of a suspect or from the time that investigating agents learned of that act. The "age" of the most recent events narrated at the time of the application for the wiretap order is variously calculated at between 34 and 46 days. Defendants cite the Florida case of *Rodriguez v. State*, 297 So.2d 15 (Fla.1974), for the proposition that, in an affidavit supporting an application for a wiretap under the Florida statute:

" * * * if the observation of the alleged offense is not further remote than 30 days from the making of the affidavit and issuance of the warrant, a finding that there exists probable cause will not be disturbed. The contrary appears where the elapsed time is more than 30 days from the date of the observation to the date on which the affidavit is executed and the warrant issued." *Id.* at 18. [Quoted from *Hamelmann v. State*, 113 So.2d 394, 396 (Fla.App. 1st 1959).]

This is doubtless true in an ordinary case, where isolated criminal acts are alleged, but we do not think the rule can be uncritically applied here. Federal authorities, interpreting the Federal analog to the Florida provision, are clear that the staleness issue must be examined more liberally when a continuing pattern of criminal activity is alleged.[5]

The leading case in this circuit dealing with the staleness of search warrant information is *Bastida v. Henderson, supra*. We wrote in that case:

> * * * In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime. The Circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance, * * *. *Id.* at 864.

The upshot of this rule in practical application has been to allow fairly long periods of time to elapse between information and search warrant in cases where the evidence clearly shows a longstanding, ongoing pattern of criminal activity. This result is even more defensible in wiretap cases than in ordinary search warrant cases, since no tangible objects which can be quickly carried off are sought. In *United States v. Kirk*, 534 F.2d 1262 (8th Cir. 1976), 21 days had elapsed between the most recent information and the issuance of the wiretap order. Observing that "[t]he activity involved was a continuing criminal conspiracy to distribute heroin," the court agreed with *Bastida* that "time is of less significance" in such a case and upheld the order. *Id.* at 1274. In *United States v. Barfield*, 507 F.2d 53 (5th Cir. 1975), *cert. denied* 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975), we held with little discussion that a 40-day lapse of time did not destroy probable cause.

It is clear from these authorities that staleness is an issue which must be decided on the peculiar facts of each case, and that a mechanical count of days is of little assistance in this determination. Here, the affidavit alleged a conspiracy that had continued for at least 2 years. It included information considerably less than 2 months old as well as the most recent telephone records available. It was permissible for the justice to infer that if criminal conversations had been occurring over this telephone line over the past 2 years, they had not mysteriously stopped within the past month. We cannot disturb on staleness grounds his finding of probable cause.

3. *Misrepresentation.* All of the defendants aver that the affidavit in support of the wiretap application contained misleading statements and misrepresentations, and that the order should be struck down as a result. *United States v. Thomas*, 489 F.2d 664 (5th Cir. 1973), *cert. denied* 423 U.S. 844, 96 S.Ct. 79, 46 L.Ed.2d 64 (1975), sets forth the standards which must control our assessment of these claims. We held there that

> * * * affidavits containing misrepresentations are invalid if the error (1) was committed with an intent to deceive the magistrate, whether or not the error is material to the showing of probable cause; or (2) made non-intentionally, but the erroneous statement is material to the establishment of probable cause for the search. *Id.* at 669.

We conclude that the affidavit before us is valid when tested against this standard.

Several supposed misrepresentations are pointed out in the affidavit. In two places, the identity of a confidential informant was made deliberately obscure. In paragraph 5(c) of the affidavit the following statement appears:

> * * * confidential source # 1, * * reported that for a period of time prior to February 1974, FRANK FELIPE, JR., W/M, date of birth 08–08–54, of Mexican

---

5. We note that even under Florida law this rule is relaxed in "extraordinary circumstances"; and at least one member of the Florida Supreme Court—the issuing magistrate—apparently thought the affidavit timely under Florida law.

ancestry, had been engaged in the importation of marijuana from Mexico, through Texas, into the Panama City, Florida area in considerable quantities. Source number 1 was in fact Frank Felipe himself, although the statement seems to imply that the source is someone other than Felipe. Again in paragraph 5(e) of the affidavit, the affiant stated:

On January 11, 1977, Special Agents Clarence Rowell and Michael Stanley interviewed confidential source # 3, believed to be reliable, regarding the activities of WILBUR SUNDAY * * *. Source # 3 is in a position to accurately report on SUNDAY's activities and obtained the information from HYDE.

Source number 3 was Wilbur Sunday. It is not clear what "information" was obtained from Hyde, but again this passage suggests that source number 3 was someone other than Sunday.

Agent Rowell testified that he chose this peculiar phrasing in these two instances to protect his informants, for whose personal safety he feared if their identities were divulged on the record. He also testified that, at least with respect to Sunday, he told Justice Adkins that there was no "extra" confidential source. He stated on the stand that he never intended to mislead the magistrate—if we wanted to mislead anyone, it was other persons who might gain access to the wiretap affidavit.

It seems to us that, in the first place, the statements complained of here are not misrepresentations in the true sense of that word. These statements are not false; they do, perhaps, give rise to a misleading impression. They are similar to the answers an evasive witness might give to an embarrassing question: true as far as they go, but ambiguous. The affiant cleared up some of the ambiguity for the issuing magistrate when he orally informed Justice Adkins that source number 3 was Wilbur Sunday. In any case, the statements were not made with an intent to deceive the magistrate. They were made with an intent to deceive other persons, and the justice was to be kept properly informed. The extreme

sanction of invalidating a wiretap order is applied to intentional misrepresentations by the government when the statements are made with an intent to circumvent regular Constitutional safeguards and corrupt the administration of justice. The statements made here were not misrepresentations as we used that term in *Thomas*; they were not intended to deceive the magistrate and vitiate Constitutionally mandated procedures.

The defendants also suggest that other statements in the affidavit were misrepresentations. They point out that Wilbur Sunday testified that he never told Mr. Rowell about a crap game in which Nolan O'Quinn lost $16,000 to him [T5, 168] and that he had not told Mr. Rowell as much about Mr. Hyde's drug dealings as Rowell asserted he had [T5, 166–69]. We decline to invalidate the application because of these suggested misrepresentations. Sunday's memory of what he did and did not tell an investigative agent over a year before may have been faulty; even if it was not, confidential informants are often not willing to swear to knowledge of information that they freely share with agents in a more informal setting. Sunday may well have feared further prosecution if he admitted too much on the stand. We cannot find in these brief statements a reason to overturn the application. Furthermore, this issue turns on a resolution of conflicting testimony, a task left to the trial judge. Here, the trial judge heard Sunday's testimony and Rowell's testimony. He chose to believe Agent Rowell, and we cannot disturb that determination.

Finally, the defendants claim that Rowell's assertions that his informants were "believed to be reliable" were misrepresentations, since he admitted on the stand that no one of them was reliable enough to make a case against the defendants in the absence of other information. The exact interchange was:

Q. Standing alone, were any of your confidential informants, in your view, reliable or credible enough to make a case if the case was based on their information alone?

A. No, sir. [T3, 100.]

We see no misrepresentation here. First of all, investigative agents are too well acquainted with the rigorous evidentiary demands of a criminal prosecution to believe uncritically that the information of a single confidential informant, however reliable, will suffice to "make a case." Additionally, an informant whose information may not be particularly reliable, standing alone, may acquire added credibility when the information supplied is corroborated from other sources, including independent investigation and information from other informants. There is, in short, no inconsistency between Agent Rowell's statements that his informants were "believed to be reliable" and his testimony quoted above.

We hold that none of the statements asserted by the defendants to be misrepresentations warrants invalidation of the wiretap order.

■■■ 4. *Other Investigative Procedures.* Both the Federal wiretap statute and the Florida wiretap statute require the magistrate to determine from the information before him that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c); Florida Statutes § 934.09. Otherwise no valid order can issue. *Cf. Berger v. New York*, 388 U.S. 41, 60, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). The legislative history makes it clear that the determination of when the Government has satisfied this requirement must be made against flexible standards, and that each case must be examined on its own facts. * * * The judgment would involve a consideration of all the facts and circumstances. Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible,

it does not follow that it is likely. [citations omitted.] What the provision envisions is that the showing be tested in a practical and commonsense fashion. * * [1968 *U.S.Code Cong. & Admin.News*, S.Rep. 1097, 90th Cong., 2d Sess., pp. 2112, 2190.]

■■■ Courts interpreting this section of the statute, following the lead of this history and background, have generally held that it is not necessary to show a comprehensive exhaustion of all possible techniques. The requirement is intended to ensure that Federal wiretap authorization procedures "were not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341 (1974). We elaborated further in *United States v. Robertson*, 504 F.2d 289 (5th Cir. 1974), *cert. denied* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975), where we wrote:

We first note that §§ 2518(1)(c) and (3)(c) must be read in a common sense fashion. They are "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." [citation omitted.] Their purpose "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." [citation omitted.] *Id.* at 293.

In short, courts will not invalidate a wiretap order simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not. It is enough if the affidavit explains the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves.

The affidavit in this case easily satisfies this requirement. It describes an elaborate 2-year history of attempts to gain enough evidence to convict the members of this large conspiracy. Since almost every line

of this part of the affidavit is challenged by the defendants, it is necessary to detail these attempts.

Normal physical surveillance of the defendants was used extensively by the agents. It was apparent from the suspects' behavior, and from information provided by confidential informants, that the conspirators were on their guard against ordinary surveillance, and it proved largely fruitless. The conspirators used citizens' band radios to monitor the whereabouts and activities of law enforcement officers. The affidavit alleges that the conspirators knew that they were suspected and were doubly careful to guard against being observed. In *United States v. Cacace,* 529 F.2d 1167 (5th Cir. 1976), *cert. denied* 429 U.S. 841, 97 S.Ct. 115, 50 L.Ed.2d 109 (1976), the affidavit stated that "individuals who frequent that residence maintain a constant vigilance for any surveillance teams in the area." *Id.* at 1168, fn. 1. In *United States v. Vento,* 533 F.2d 838 (3d Cir. 1976), the affidavit stated that the suspect "was reputed to be suspicious and had warned his neighbors to be on the alert for panel trucks and strangers in parked cars." *Id.* at 850. In both cases, these assertions were viewed as contributing to the Government's proof of the probable failure of normal surveillance. Similar assertions in the affidavit before us make the same contribution here.

The agents made extensive use of confidential informants in their efforts to collect incriminating evidence. No fewer than 12 such informants worked with the agents at one time or another. Two of them, Lottie Calhoun and Wilbur Sunday (both members of the conspiracy), were even arrested and planted back into the conspiracy in an attempt to gather firsthand information. While the web of informants provided some useful information, the evidence thus gathered was insufficient to warrant the arrest of several conspirators, particularly the more highly placed ones. Government agents also went undercover and attempted to infiltrate the operation, also without success. The use of informants and infiltrators had failed convincingly, and there was no reason to suppose that it would be any more successful in the future.

■ Ordinary search warrants were considered, but were not obtained. The affidavit recites that probable cause could not be developed. The defendants seize upon this statement as an admission that probable cause could not have existed for the wiretap order, either. Clearly, however, probable cause to intercept communications may exist even where no tangible evidence can be found. In this case, involving the transportation and distribution of large amounts of narcotics, Justice Adkins could reasonably have concluded that ordinary search warrants would be unsuccessful because evidence of the crime was never in one place long enough for agents to learn of its whereabouts, obtain a warrant, and seize it.

Agents also attempted to capture some of the conspirators "red-handed." Arrangements were made for a large undercover buy, which never took place even though extensive preparations were made. The defendants criticize this large buy as unrealistic, abnormal, and unlikely to succeed; but we think that it was a normal technique for trying to apprehend persons who routinely transacted in such large quantities of narcotics. (It appears from the record that this plan came very close to succeeding.) Other efforts, also unsuccessful, to apprehend other conspirators in possession of narcotics were also described in the affidavit.

■ The affidavit made another crucial allegation, challenged by none of the defendants and adding to the Government's proof of the impracticability of other methods. It was stated that most of the informants feared for their lives if they gave information openly to agents or attempted to probe too deeply into the workings of the conspiracy in an effort to gather information. The Government has never been required to subject its agents and informants to undue personal danger in order to satisfy the requirements of 18 U.S.C. § 2518(3)(c). *United States v. Vento, supra.* This was yet another reason why the justice could

have been convinced that ordinary investigative techniques were unlikely or "too` dangerous" to succeed.

■ Finally, the affidavit makes it clear that the wiretap was necessary to ascertain the full scope of the conspiracy under investigation and to gather evidence against the leaders of the organization. According to the affidavit: "None of the informants have the ability to cause the arrest of the entire group of principals." [p. 27.] The ordinary investigative techniques had been used for 2 years, but had been ineffective to gather evidence against the top-level conspirators. They were unlikely to do so in the future. Justice Adkins could conclude that the ordinary techniques had been shown insufficient to collect this kind of information. The Third Circuit endorsed this reasoning in *United States v. Armocida*, 515 F.2d 29 (3d Cir. 1975), *cert. denied sub nom. Gazal v. United States*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975):

> When the wiretap application was made, the government's objective was to ascertain the scope of the alleged narcotics conspiracy and to identify the participants. * * * Although the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned. * * * *Id.* at 38.

*See also United States v. Daly*, 535 F.2d 434, 438 (8th Cir. 1976).

We conclude that the affidavit abundantly satisfied the requirements of 18 U.S.C. § 2518(3)(c). It was reasonable for the justice to conclude that normal investigative procedures had been tried and failed, and that further normal investigation was unlikely to succeed.

■ 5. *Minimization.* Two defendants contend that the requirements of 18 U.S.C. § 2518(5) and Florida Statutes § 934.09(5) were not complied with. These statutes require that the intrusions of the privacy of those whose communications are intercept-

ed to be held to a minimum (consistently with the purposes of the wiretap). If the minimization requirement is blatantly disregarded, the information obtained through the wiretap may be suppressed. *Rodriguez v. State, supra*, at 19–22; *United States v. Scott*, 164 U.S.App.D.C. 125, 504 F.2d 194 (1974).

The monitoring agents in this case testified that they were instructed to listen to any call that was relevant to the narcotics investigation. Every call was taped until it became clear that it did not concern criminal activity; the tape was then shut off. No purely personal calls, as between Mrs. Hyde and her mother, were listened to.

■ The minimization standard applies a test of reasonableness to the peculiar facts of each case. *United States v. Daly, supra*, at 441. Three factors are considered in deciding whether attempts to minimize were reasonable: (1) The nature and scope of the criminal enterprise under investigation; (2) The Government's reasonable inference of the character of a conversation from the parties to it; and (3) The extent of judicial supervision. *United States v. Kirk, supra; United States v. Daly, supra.*

The criminal enterprise under investigation here was a large and complex conspiracy. It has been recognized that such organizations usually require considerable intrusion by the monitoring agents.

> * * * Large and sophisticated conspiracies may justify more electronic surveillance than a single criminal act. * * * This is an especially strong consideration where, as here, the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped. * * * [*United States v. Daly, supra*, at 441.]

It was appropriate for agents investigating this widespread conspiracy to monitor calls more extensively than might have been appropriate in a simpler case. We think that the monitoring of every call made until its character was determined was reasonable.

**870**

■ The Government's reasonable expectations of the character of the conversations also justified this approach. Several courts have expressly approved the procedure followed here, and we join them. The Court of Appeals for the District of Columbia, in *United States v. Scott*, 170 U.S.App. D.C. 158, 516 F.2d 751 (1975), *cert. denied* 425 U.S. 917, 96 S.Ct. 1519, 47 L.Ed.2d 768 (1976),[6] wrote:

> * * * the only feasible approach to minimization is the gradual development, during the execution of a particular wiretap order, of categories of calls which most likely will not produce information relevant to the investigation. Once the monitoring agents have sufficient data to conclude that a particular type of conversation is unrelated to the criminal investigation, the minimization requirement obliges them to avoid intercepting future conversations as soon as they can determine that it falls within that category. Until such categories become reasonably apparent, however, interception of all calls will be justified under the wiretap authorization. [fn. omitted.] In addition, even after such a category is developed, it will likely still be necessary to intercept some portion of each call to determined whether it falls into the category being minimized. [fn. omitted.] *Id.* at 161, 516 F.2d at 754–55.

The defendants argue that calls between Mr. Hyde and his attorney and physician were monitored, and that these calls should have been privileged—another supposed violation of the minimization requirements. But the agents listened to these calls only long enough to determine that the doctor and lawyer were not participating in the conspiracy; no further intrusion was made. Indeed, several calls to the attorney were not monitored at all. It would be unreasonable to expect agents to ignore completely any call to an attorney or doctor; doctors and lawyers have been known to commit crimes. The agents' conduct was entirely correct.

■ Finally, the agents furnished two reports of ongoing surveillance to Justice Adkins in the course of the monitoring. Since the wiretap lasted only 30 days, this was adequate judicial supervision and evidences no intent by the monitoring agents to exceed the scope of the order.

We hold that the minimization requirements of both Federal and Florida law were fully met by the conduct of the agents in this case.

■ 6. *Unsealing.* One defendant argues briefly that the tapes were not unsealed in the manner required by the wiretap order, and that the evidence contained in them should therefore be suppressed. Even if we were inclined to invoke such an extreme sanction in the absence of any hint of governmental misconduct, the attorneys for all four defendants stipulated that a proper chain of custody of the tapes had been maintained and that the tapes were not tampered with. Such a stipulation deprives the objection of any substantive force. The evidence should not be suppressed on such a purely technical ground.

We hold, therefore, that the wiretap order, the conduct of the monitoring agents, and the subsequent handling of the tapes all conformed to the requirements of the law. The evidence obtained from the tapes was properly admitted against all four defendants.

## II. *The Arrest and Search*

The three defendants arrested in Texas object to both their arrests and the searches made of their persons, car, and apartment. The defendants assert that no probable cause existed for any of these actions, or that if it did exist the investigating agents had time to obtain search and arrest warrants. Three arrests and two searches were made; each must be examined individually.

Agent Rowell, one of the monitoring agents on the wiretap, informed Agent

---

6. The minimization in this case was expressly approved by the Supreme Court in a later ap-
peal. *Scott v. United States,* —— U.S. ——, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).

Glazener in Texas at 10:00 p. m. on March 14, 1977, that Mr. Middlebrooks was somewhere in Texas. His car was to be driven to McAllen, Texas, loaded with marijuana, and returned to him at an unspecified location and time. The phone call which provided this information was from Mr. Middlebrooks to Mr. Hyde. Mr. Middlebrooks did not divulge where he was, but did give the impression that his car had already been taken away and that the transaction was under way. Agent Glazener went immediately to Mr. Arenas' apartment in McAllen and observed Mr. Middlebrooks' car parked outside. He kept the car under continuous observation from that time on. At about 1:00 in the morning of March 16, 1977, the car departed, and agent Glazener followed it as described above.

■ Glazener testified that he did not feel that he had probable cause to arrest Mr. Arenas until the car had been left at the motel in Corpus Christi and Mr. Arenas prepared to leave. Until that time he could not be sure that the marijuana was in the car and the transaction was complete. We agree. Agent Rowell was a reliable informant who had given accurate information before; but, until the car keys were delivered to the motel room, all Glazener had observed was someone driving Mr. Middlebrooks' car. He could not be sure that the marijuana was not to be picked up by Mr. Arenas at some other location (the car actually stopped a few times between McAllen and Corpus Christi). The delivery, which corroborated Agent Rowell's information and signified that the transaction had been completed, caused Glazener's suspicions to ripen into probable cause. Arenas' arrest was lawful; there was clearly no time to obtain an arrest warrant at the moment Arenas was preparing to leave.

This reasoning also disposes of the contention that there was no probable cause to arrest Mr. and Mrs. Middlebrooks. If the transaction had in fact been completed, the Middlebrooks were now in possession of the narcotics. Since there was probable cause

to believe that the transaction was complete, the arrest of the Middlebrooks was lawful. Again, there was insufficient time to obtain arrest warrants between the establishment of probable cause and the possible flight of the couple.

■ There were two separate searches following the arrest. The first was a search of the apartment where the Middlebrooks were arrested. The defendants object to the evidence obtained from this search on the grounds that much of it was taken from an area outside the "one-lunge zone" described in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The short answer to this objection is that, as far as can be ascertained from the record, all of the items admitted into evidence at the trial (consisting mostly of cocaine and marijuana paraphernalia) were in plain view inside the apartment.[7] Since there was probable cause to make the arrest, the agents were in a place where they had a right to be, and could seize evidence in plain view. *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). The one-lunge rule of *Chimel, supra,* is therefore inapplicable.

■ The agents also obtained the keys to the Middlebrooks' car from Mr. Middlebrooks and opened the trunk, where they found 217 pounds of marijuana. Defendants object to this search, saying that there was no reason why the car could not have been taken into custody and a warrant obtained. Such an argument was rejected by the Supreme Court in *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Whether the officers searched the car on the spot or seized it, towed it to the police station, obtained a warrant, and searched it later was immaterial under the Fourth Amendment. *United States v. Mitchell,* 538 F.2d 1230 (5th Cir. 1976), cert. denied 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977); *United States v. Soriano,* 497 F.2d 147 (5th Cir. 1974).

7. The trial judge apparently realized this, since he did exclude from evidence a quantity of cocaine found concealed inside a bathroom Kleenex dispenser not in plain view.

The arrests and searches were supported by probable cause. No warrants were required because probable cause arose only at the moment of arrest and search. Warrantless proceedings were justified by exigent circumstances. The evidence obtained from the searches was properly admitted at trial.

### III. Sufficiency of the Evidence

■ Defendant Hyde contends that the evidence adduced at trial, while sufficient to convict him of conspiracy to possess, with intent to distribute, marijuana, did not suffice to convict him on Count II of the indictment: conspiracy to possess, with intent to distribute, cocaine.[8] On appeal from a conviction, we must view the evidence in the light most favorable to the Government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). By this standard, we conclude that there was abundant evidence to convict Hyde on Count II, especially since once an illegal conspiracy has been established (and a conspiracy to smuggle cocaine was proved here) only "slight evidence" is needed to connect an individual defendant with it. United States v. Edwards, 488 F.2d 1154 (5th Cir. 1974).

■ Credible evidence introduced at the trial demonstrated the extent of Mr. Hyde's involvement with cocaine. Anita Clancy testified that she obtained cocaine from Mr. Hyde. Robert Vaughn and Nolan O'Quinn both discussed cocaine prices with Mr. Hyde and Mr. Middlebrooks (whose complicity in the cocaine conspiracy was established beyond question). Jackie Hyde (the wife of Louis Lee Hyde), who suggested that the conspiracy disband after a cocaine transaction almost led to an arrest, referred to "yours [Middlebrooks'] and Louie's business." Mr. Hyde's telephone was used by the Middlebrooks to arrange cocaine transactions. Mr. Hyde talked to the Middlebrooks about a particular cocaine smuggling operation while it was actually in progress. After the smuggling was complete, Mr. Hyde discussed with the Middlebrooks the quality of the "stuff," which would have to be "cut some." Mr. Hyde and Mr. Middlebrooks talked about "getting distribution going." Finally, Anita Clancy testified that she witnessed Mr. Hyde giving hundreds of dollars to the Middlebrooks, telling them to buy marijuana and cocaine with it. The jury could permissibly have found from this evidence that Mr. Hyde was guilty on Count II. Cf. United States v. Sisca, 503 F.2d 1337 (2d Cir. 1974), cert. denied 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974); United States v. Apollo, 476 F.2d 156 (5th Cir. 1973); United States v. Young, 470 F.2d 962 (9th Cir. 1972), cert. denied 410 U.S. 967, 93 S.Ct. 1444, 35 L.Ed.2d 701 (1973).

### IV. Conduct of the Trial

■ Defendant Arenas contends that the manner in which the trial was conducted denied him due process of law. Specifically, he objects to certain questions asked of jury members on voir dire; to an in-court identification of two spectators as criminal associates of Mr. Hyde; to the Government's alleged "concealment" of its witnesses; to the testimony of the Government's chemist, and to the trial judge's failure to afford an opportunity for re-cross examination. Taking the last point first, a denial of re-cross examination is a decision committed to the sound discretion of the trial judge, and will not be reviewed except for abuse of discretion. United States v. Morris, 485 F.2d 1385 (5th Cir. 1973); United States v. Landers, 484 F.2d 93 (5th Cir. 1973), cert. denied 415 U.S. 924, 94 S.Ct. 1428, 39 L.Ed.2d 480 (1974). No abuse of discretion has been demonstrated to us. As for the other four contentions, we have examined the record and we find them without merit.

---

8. It is typically difficult for a defendant to prove that he participated in only one of two closely overlapping conspiracies. See United States v. Tramunti, 513 F.2d 1087, 1105–07 (2d Cir. 1975), cert. denied 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); United States v. Wilner, 523 F.2d 68 (2d Cir. 1975).

## V. *Conclusion*

We conclude that the proceedings below, from the application for the wiretap order through to the final verdicts, were regular in every respect. Therefore the judgment of the district court is

AFFIRMED.