376 So.2d 864 (1979)
STATE of Florida, Appellant,
v.
Richard BRAINARD, Fred Brizzi, Vickie Lyons, Darwin Salls, Jonathan B. Smith, Thomas Wagner, and Sallie Wolf, Appellees.
No. 78-46.
District Court of Appeal of Florida, Second District.
August 1, 1979.
As Corrected On Denial of Rehearing October 12, 1979.
Jim Smith, Atty. Gen., Tallahassee, and Richard G. Pippinger, Asst. Atty. Gen., Tampa, for appellant.
Joseph G. Donahey, Jr. of Tanney, Forde, Donahey & Eno, P.A., Clearwater, for appellee Salls; John D. Fernandez, Clearwater, for appellees Lyons and Wagner; Charles J. Morachnick, Seminole, for appellees Brainard and Wolf; William A. Borja, Clearwater, for appellee Brizzi; and Terry Furnell of Gross & Doherty, Clearwater, for appellee Smith.
GRIMES, Chief Judge.
The state charged appellees with possession of over 100 pounds of marijuana and conspiracy to possess over 100 pounds of marijuana. Subsequently appellees moved to suppress certain evidence gathered from three wiretaps which had led to their arrest. The court granted their motions. The state appeals.
Judge B.J. Driver considered the application for the first wiretap and accompanying affidavit on September 23, 1976. He entered the wiretap order on the same day. Since an understanding of the facts contained *865 in the affidavit is necessary to our discussion of questions with which the parties have presented us, we will set out those facts in some detail. We note here that the probable cause necessary to justify the second and third wiretap orders came in large part from information gained as a result of the first wiretap order. Therefore, if suppression was proper as to the first wiretap, it was also proper as to the other two. By the same token, if the affidavit for the first wiretap was legally sufficient, the other two affidavits were clearly adequate.

THE AFFIDAVIT
On August 2, 1976, Lieutenant Willard of the Holmes Beach Police Department contacted Detective Gieseke of the Clearwater Police Department to report that he had obtained information about a possible attempt to smuggle 10,000 pounds of marijuana and other narcotics into the Clearwater area. According to Willard, he had been contacted earlier that day by Billy Higgins. Higgins told Willard that he and his brother James had been involved in a "ripoff" of one Thomas Wagner and that his brother was now missing. Higgins feared for his brother's life and for his own, so he contacted Willard in an attempt to locate his brother. According to Higgins, Thomas Wagner was the owner of a bar in Clearwater known as The Den. Higgins stated that he and his brother had grown up with Tom Wagner and knew that Wagner made his money smuggling narcotics into Florida from South America. Higgins also said that Wagner owned a white Triumph sports car, a white Thunderbird, and a 30-foot sailboat and lived on the water in the area of Eighth Street and "Bay Vista" Drive in Indian Rocks Beach. Higgins told Willard that he had been contacted by an associate of Wagner's about a possible smuggling incident into Clearwater that night.
After Detective Gieseke received Willard's report, the Clearwater Police Department made attempts to verify the information. Detective Morse surveyed the Eighth Street and "Bay Vista" area in Indian Rocks Beach but could not find any street known as Bay Vista. Gieseke then went to the Alcoholic Beverage Commission and discovered from its records that the licensed owner of The Den in Clearwater was Thomas Wagner who listed his address as 9038 Walsingham Road in Largo and listed his phone number as 397-3947. On the night of August 2 and the early morning hours of August 3, members of the vice and narcotics unit surveyed the Walsingham Road address but saw no activity. The next day, Morse inquired at the General Telephone office and discovered that phone number 397-3947 had been listed in the name of Vickie Lyons and had been located at 9038 Walsingham Road. However, that phone had been disconnected almost one year before. Morse did discover that Vickie Lyons had a new number, 596-4934, located at 314 Bahia Vista Drive in Indian Rocks Beach. Also, Morse found out that Vickie Lyons had been arrested for the sale and possession of narcotics almost three years before.
Detective Valentine discovered that Thomas Wagner had purchased The Den in 1975, and that tax records listed his address as 314 Bahia Vista Drive, Indian Rocks Beach. Valentine also discovered, through examination of the county records, that Thomas Wagner was the owner of the residence located at 314 Bahia Vista Drive. Meanwhile, on August 4, Detective Gieseke went to 314 Bahia Vista Drive and observed two vehicles parked there. One was a white Triumph and the other a white T-Bird. An investigation of the license numbers revealed that both vehicles were registered to Vickie Lyons. Gieseke also checked with the Clearwater Harbormaster's office and found out that Thomas Wagner had, in the past, moored a 30-foot yacht registered in his name in the harbor but that he had moved it to an unknown location a few months earlier.
According to Detective Gieseke, a confidential informant of unknown reliability informed him on July 28, 1976, that drug trafficking occurred at The Den. At the time, the bartender and manager of The Den was Robert Russell, who, six months *866 before, had been arrested after attempting to sell two pounds of marijuana to Detectives Gieseke and Valentine.
Gieseke obtained through subpoena the phone records for Vickie Lyons' telephone number, 596-4934. Long distance records from May 1976 through July 28, 1976, showed at least twelve calls to either a Carlos Robinson, an Enrique La Coulture, or a person named Estavanic in Barranquilla, Colombia, South America. The investigation of the telephone records also revealed several telephone calls to the home of Elizabeth Day in Matlacha, Pine Island, Florida, and to a Fort Myers' number registered to Roger Harvey. Gieseke contacted Sergeant Hillmyer of the Lee County Sheriff's Office who said that Day was the owner of a shrimp boat docked in the Fort Myers area and that her boat had been reported to him through unconfirmed sources as having been involved in smuggling marijuana and other narcotics. Sergeant Hillmyer also told Gieseke that Harvey had been long involved in narcotics smuggling operations. Hillmyer then advised Gieseke to get in touch with Raymond Yates of the Federal Drug Enforcement Administration.
According to Agent Yates, prior to his contact with the Clearwater Police Department he had been investigating a smuggling operation involving importation by means of aircraft from Colombia, South America. During the course of this investigation Yates identified one of the principals in the smuggling operation as an individual known only to him as Tom. According to Yates' information Tom owned a bar in Clearwater and dated a girl named Vickie. Yates also stated that during the course of his investigation he became aware of a white male matching Tom Wagner's description who had been observed at the Clearwater Air Park the month before in a white Thunderbird registered to Vickie Lyons of 314 Bahia Vista Drive in Indian Rocks Beach. Yates noted that on August 12, 1976, he had spoken confidentially with a person who had admitted being involved in a smuggling operation into Okeechobee. This individual informed Yates that during the period June 3 through June 7, 1976, he had participated in an offloading operation of approximately 800 pounds of marijuana and other narcotics and had overheard conversation to the effect that a person by the name of Tom had guaranteed the sale and distribution of these narcotics. Yates' informant also identified several other persons participating in that particular narcotics smuggling operation, including Fred Brizzi and Sidney Barrett, Jr.
On August 13, 1976, Agent Yates learned that Sidney Barrett, Jr., one of the persons mentioned by his confidential informant, was in the Sarasota County Jail on a probation violation charge. Yates went to the jail and spoke with Barrett. Barrett admitted that he had piloted the aircraft that flew in the 800 pounds of marijuana to Okeechobee. Barrett also admitted that Fred Brizzi had solicited his cooperation as pilot of that aircraft and that Fred Brizzi appeared to be a partner in an organization which included a person by the name of Tom who owned a bar in Clearwater and drove a white Ford Thunderbird. Barrett said that this organization had been responsible for weekly importations of large quantities of narcotics in the past and that on two occasions he had flown to Barranquilla, Colombia, in South America and had contacted an individual by the name of Carlos Robinson. On August 6, 1976, Barrett had piloted an aircraft from Sarasota to Barranquilla, Colombia, and returned with a load of marijuana. Upon his return the airplane crashed in Sarasota County and he was arrested. According to Barrett, Fred Brizzi and Tom witnessed the crash.
On August 24, 1976, Agent Yates had a conversation with Barrett's attorney Larry Turner. Turner told Yates that Barrett knew that Fred Brizzi and Tom were still engaged in smuggling activities and that they planned to or had recently purchased a new aircraft to replace the one which Barrett had destroyed in the August 6 crash. Turner also informed Yates that Barrett would refuse to divulge any further information about smuggling activities unless he was granted immunity from both federal and state prosecution.
*867 On September 10, 1976, Detective Valentine obtained telephone toll records from Vickie Lyons' telephone number through August 28, 1976. Those records revealed four calls from August 1 to August 4 to the Colombia number. Thomas Wagner had made the calls to Carlos Robinson and Enrique La Coulture.
In its suppression order, the trial court made the following findings of fact.
1. That in their Affidavits for Application for Order Authorizing Interception of Wire Communications, law enforcement personnel created the impression that probable cause for the issuance of an Order was current, ongoing, continuing and immediate.
2. That the impression of present probable cause was enhanced by the failure of the affiants to recite the dates upon which certain related events, described in the Affidavit as "current", had in fact occurred; i.e., the "drug rip-off deal" that James Higgins was allegedly involved in was presented in the present tense, when it in fact had occurred more than a year prior to the Application; and the recitation that James Higgins was currently missing when, in fact, his absence had been known for at least ten months prior to the Application, with the further testimony that such absence on the part of the individual was not unexpected or unusual.
3. That the issuing Judge was informed sometime during the Application proceedings, orally and without the conversations being recorded in writing so that they could be specifically reviewed, that calls to Colombia, South America, were currently being made from the target telephone facility, when in fact the last such call occurred fifty-one (51) days prior to the date of the Application; while conceding that the issue of "staleness" cannot be solved by a simple application of numbers of days, and that Florida's 30-day "rule-of-thumb" as to staleness (Rodriguez v. State, 297 So.2d 15, [1974]) could be extended because of the nature and circumstances of this case, to do so should require clear and convincing reasons why the interval of 51 days was not an unreasonably long delay.
4. That confusion concerning the completeness of certain exhibits submitted to the issuing Judge as part of the Affidavit for Application makes it impossible at this time to determine exactly what the issuing Judge relied upon in issuing the Order Authorizing Interception; that this deprives the Defendants of their right to judicial review of the wire-tap application process, guaranteed by both federal and state constitutions and by state law, and further deprives the defendants of due process of law.
From these findings, we think that it can fairly be said that there were three matters which concerned the trial court and caused it to grant appellees' motion. These were 1) written and oral misrepresentations as to the current nature of the information contained in the affidavit, 2) confusion over the existence of the exhibits to the affidavits, and 3) staleness of the information contained in the affidavit. We have considered each of these matters and, after careful examination of the record and relevant authorities, have reached the conclusion that none of them justified suppression. We shall deal with each concern separately.

WRITTEN AND ORAL MISREPRESENTATIONS
The only written misrepresentation referred to by the court concerned James Higgins. However, we find that there was no misrepresentation. While it is true that testimony revealed that James Higgins had been missing for some time, this same testimony also showed that when Bill Higgins talked to Lt. Willard, his brother was still missing. Accordingly, the statements made in the affidavit were correct. Moreover, whether or not James was missing and when he disappeared had little if anything to do with the substance of the affidavit. James' continued absence may have prompted Bill to talk to Lt. Willard but the importance of the contact lay in the fact that Bill told Willard that Thomas Wagner was still involved in marijuana and cocaine smuggling as of August 2, 1976.
*868 In its third finding the court said that during the application proceedings the issuing judge received oral representations that calls to Colombia were currently being made when in fact the last recorded call had occurred fifty-one days earlier. Our review of the record reveals no support for this conclusion. We suspect, however, that the court based its finding on the following testimony of Judge Driver.[1]
Q. Judge, in reference specifically to the calls to South America, do you have any recollection of whether or not anyone either through the written material in the affidavit or orally told you or was able to designate for you how recently they had been made? What I mean by recently, recently to the date of application which was September 23rd.
A. Mr. Donahey, I don't want to evade your question or mislead you but I want to answer the best I can. I have had several of these wiretaps. To the best of my recollection with the understanding that it is a general recollection, I was informed that the calls to South America were on an ongoing basis. They were recent and they were continuing and I am sure this is the case I recollect being advised of it.
Standing alone, this testimony might lend credence to the court's conclusion. But, it must be read in the light of this statement of Judge Driver.
MR. TRAGOS: The only thing I want to ask, Judge, to make a statement clear, you based your Order on what was written in the Application and not on any oral representations, is that correct?
THE DEPONENT: Yes, I couldn't base it on oral representations.
At another point Judge Driver said:
I will say this; if it had been based on some oral representation I couldn't have considered it. I don't want to limit you, as I said, but this Affidavit, that was the basis for the Order I entered.
It would not be surprising that in presenting the applications to Judge Driver the law enforcement officers characterized the facts in the affidavit as reflecting that the calls being made to South America were of a continuing nature. But this does not mean that Judge Driver based his order upon any conclusion offered by the police. He made it very clear that from his own study of only those facts set forth in the affidavit, he concluded that the calls to South America were being made on an on-going basis.

CONFUSION OVER EXHIBITS
The next reason the trial court assigned for suppressing the wiretap evidence was confusion over whether a complete set of exhibits was attached to the affidavit which Judge Driver considered. Apparently Judge Driver signed a true copy of the affidavit which did not include certain pages of some of the exhibits. Thus after defense attorneys received copies of the true copy, they made inquiry into what Judge Driver had actually seen when he issued the wiretap order.
Judge Driver testified that he fully examined all of the exhibits attached to the original affidavit, though he could not remember the specific details of each exhibit. However, Assistant State Attorney Fugate testified that the complete exhibits were attached to the original affidavit which he presented to Judge Driver. Since there was a complete set of exhibits attached to the original affidavit when the court heard the motion to suppress, in order to sustain the appellees' position we would have to assume that the state attorney's office attached the balance of the exhibits to the original affidavit sometime after Judge Driver had seen it. Yet the trial court, itself, specifically absolved the state attorney's office of any misconduct concerning confusion over the exhibits. In short, then, we do not believe the record supports the conclusion that Judge Driver did not see the full set of exhibits to the original affidavit when he issued the wiretap order.

*869 STALENESS
The final issue we must consider, and the one upon which appellees lay the most stress, is whether the evidence in the affidavit was too stale to support the issuance of the wiretap order. The leading case in Florida on the question of staleness is Rodriguez v. State, 297 So.2d 15 (Fla. 1974). There, our supreme court said,
[W]e would note that the issue of "staleness" cannot be solved by a simple application of numbers of days without consideration of the overall particular circumstances presented by the case.
297 So.2d at 18. The court went on to hold that the affidavit when considered as a whole must present sufficient facts to establish probable cause to believe that a crime is being or is about to be committed and that the wiretap will provide evidence of this crime.
Our reading of the affidavit in this case convinces us that it meets the supreme court's test.[2] The facts demonstrated the existence of a well-organized drug smuggling ring which had been operating for at least several months and which had, during that time, made constant use of the telephone in its operations. Moreover, information obtained on August 24 from attorney Larry Turner indicated that appellees intended to continue their operation despite the August 6 plane crash.
Appellees strenuously argue that given evidence of current operations, there was still no evidence of current use of the telephone in those operations because the last phone call came on August 4. Yet, the break in communications with Colombia would have been a natural result of the interruption of smuggling caused by the August 6 plane crash. We think that the issuing judge could reasonably assume that, in view of the many previous calls, once the smuggling began again, use of the telephone would resume.
Decisions from the United States Court of Appeals, Fifth Circuit, support our conclusions. In United States v. Hyde, 574 F.2d 856 (5th Cir.1978), which dealt with facts similar to those here, the court reviewed a wiretap issued by Justice Adkins of our supreme court. It said:
The leading case in this circuit dealing with the staleness of search warrant information is Bastida v. Henderson, supra [5 Cir., 487 F.2d 860]. We wrote in that case:
* * * In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime. The Circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance, * * *. Id. at 864.
The upshot of this rule in practical application has been to allow fairly long periods of time to elapse between information and search warrant in cases where the evidence clearly shows a longstanding, ongoing pattern of criminal activity. This result is even more defensible in wiretap cases than in ordinary search warrant cases, since no tangible objects which can be quickly carried off are sought.
It is clear from these authorities that staleness is an issue which must be decided on the peculiar facts of each case, and that a mechanical count of days is of little assistance in this determination. Here, the affidavit alleged a conspiracy that had continued for at least 2 years. It included information considerably less than 2 months old as well as the most recent telephone records available. It was permissible for the justice to infer that if criminal conversations had been *870 occurring over this telephone line over the past 2 years, they had not mysteriously stopped within the past month. We cannot disturb on staleness grounds his finding of probable cause.
574 F.2d at 865.
In United States v. Weinrich, 586 F.2d 481 (5th Cir.1978), the court equated the magistrate's evaluation of an affidavit for wiretap with that of an affidavit for a search warrant in which it was said that:
[T]he magistrate must use his own judgment based on the entire picture presented to him and utilizing his common sense. Bastida v. Henderson, 487 F.2d 860 (5th Cir.1973). "[W]hen this is done his determination is conclusive in the absence of arbitrariness." Id. at 863; United States v. Hyde, supra, 574 F.2d at 862.
586 F.2d at 487.
From a study of the four corners of the affidavit, we believe it reasonable that Judge Driver could have concluded that the pattern of criminal activity and the use of the telephones were sufficiently current to justify the issuance of the wiretap order. In so ruling we are not substituting our judgment for that of the court below because it was Judge Driver who had the responsibility of determining staleness based upon the facts of the affidavit.
We reverse the order of the trial court and remand the case for further proceedings consistent with this opinion.
HOBSON and DANAHY, JJ., concur.
NOTES
[1] Judge Driver testified by deposition.
[2] In its Rodriguez opinion the court made reference to a thirty day "rule of thumb" for determining whether the information contained in an affidavit is stale. While the supreme court emphasized that the thirty day rule is not mandatory, we note that here the most recent information which the police received came on August 24, 1976, which was within thirty days of the issuance of the wiretap order.