# STATE OF FLORIDA v. QUESADA, et al.
## No. 81-17247D-FF, 81-17250
Eleventh Judicial Circuit, Dade County
September 16, 1982

Joel Rosenblatt, Peter Outerbridge, for plaintiff.

Doug Williams, Kurt Monroe, William Cagney & Rita Cohen, for defendants.

GERALD KOGAN, Circuit Judge

This cause came on to be heard pursuant to defendant's motions to suppress evidence gathered by court authorized electronic surveillance. This Court held an evidentiary hearing lasting more than eight full weeks and heard legal argument lasting many hours. This Court has reviewed all of the numerous exhibits and other evidence in this case. The Court has read all legal memoranda of counsel submitted by all parties consisting of almost two hundred legal sized pages and has reviewed the authorities cited therein. The Court has, in addition, researched the law on all of the various issues raised.

Prior to his Court setting forth its findings, the Court makes the following observations concerning the interception of private communications between individuals who have no desire that these conversations be overhead by unauthorized persons.

The Constitutions of the United States and the State of Florida stand as a bulwark against governmental intrusion into the private lives of our citizens. The greatest intrusion into the private lives of our citizens in the opinion of this Court, is the unwarranted interception of private conversations, whether over the telephone or in one's home.

In order to safeguard these private conversations from improper governmental eavesdropping, the State of Florida adopted Chapter 934 of the Florida Statutes. This chapter sets up strict requirements which must be adhered to so that an individual's right to privacy will not be eroded. With this premise in mind, the Court makes the following findings of fact and conclusions of law:

Constitutionality of Chapter 934 Of The Florida Statutes

The courts of this State have addressed the constitutionality of Chapter 934. That chapter has been found to be constitutional by every court that has considered the issue. *See United States v. Sklaroff,* 506 F.2d 837 (5th Cir. 1975), *cert. den.,* 423 U.S. 874 (1975).

Even though the Florida constitution contains a specific right to privacy this does not make Chapter 934 unconstitutional. The statute provides sufficient guidelines to ensure that wiretaps are conducted only for the limited purpose of criminal investigation where necessary. Unlike the New York Statute found unconstitutional in *Berger v. New York,* the Florida Statute requires a new showing of probable cause to continue surveillance beyond the maximum 30 day period. The Florida statute, patterned after Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §2510-2520, informs the police, the state attorney and the courts of exactly what must be done to comply with the statute. Strict compliance with these requirements ensures the constitutionality of Chapter 934.

This Court finds that on its face Chaper 934 is constitutional under both the constitutions of the United States and the State of Florida.

However, the Court finds that in this case, not only has there been lack of strict compliance with the requirements of the statute but also there has been an almost total disregard for the safeguards that the legislature has imposed. These statutory violations go to the very heart of the statutory scheme employed to prevent abuse. These violations go contrary to the purpose behind the statute and therefore make the interceptions unlawful as will be explained further in other parts of this Order. This Court, though reluctant to do so, must suppress all of the evidence derived from the Ortega wire interceptions, the Quesada wire interceptions and the Quesada room bug.

State Attorney Special Investigators

The investigations in this case were conducted in the City of Miami and in the City of Coral Gables. One of the issues raised is the authority of the City of Miami Police Department to conduct this investigation outside their jurisdiction without meeting the requirements of *Fla. Stat.* 27.251.

Section 27.251 (Supp. 1978) authorizes the appointment of municipal police officers for some purposes as special investigators for the State Attorney, and provides for the posting of a bond and the taking of an oath of office, in order to investigate in another municipality. *See Fla. Stat.* §27.255(4). The defendants argue that since the bonds were not posted before the investigation began, the police were acting outside their official capacity and therefore all their actions are null and void. *Stinton v. State,* 80 So. 506 (Fla. 1918).

The case law of this state supports the position that a police officer may conduct investigations outside the city limits where the subject matter of the investigation originated *inside* the city limits. *State v.*

*Chapman,* 376 So.2d 262 (Fla. 3rd DCA 1979), *cert. den.,* 386. Unlike *Wilson v. State,* 403 So.2d 983 (Fla. 1st DCA 1980), where there was no evidence in the record of any action taken by the police inside the city limits, in this case, the investigation did begin in the City of Miami. The initial meetings between the confidential informant and the City of Miami police and the first party consent call both occurred in the City of Miami.

Since the investigation in this case began within the city limits of Miami, the City of Miami police had the authority to continue their investigation outside the city limits. *Parker v. State,* 362 So.2d 1033 (Fla. 1st DCA 1976).

However, while the City of Miami police officers may conduct an investigation in this manner, there is a more important issue raised. Can municipal police officers (Coral Gables and Miami), act in the official capacities as special State Attorney's Investigators without having been properly qualified as such under *Fla. Stat.* 27.251 and 27.255. This Court believes that they cannot.

This Court finds that while officers of Miami and Coral Gables were appointed by State Attorney Janet Reno and took the oath of office they failed to post the bond as required by law. Until that bond was posted they could not act as special investigators for the State Attorney's Office. None of these bonds were posted, the court finds, until several months after the termination of the interceptions of oral and wire communications in this case.

The Court further finds that all of the oral and wire communications in this case were intercepted by such unqualified persons who had not posted the required bonds.

The orders for each interception of wire or oral communications in this case signed by Judge Thomas Scott authorized the interceptions to be made by "the State Attorney for the Eleventh Judicial Circuit of Florida and/or all her sworn investigators thereof".

Since none of the persons who intercepted the communications sought to be suppressed in this case were properly qualified special State Attorney Investigators, they had no authority to intercept communications under Judge Scott's orders.

Therefore, based upon this ground alone, the motion to suppress must be granted.

Pen Register

In *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577 (1979), the Supreme Court expressly held that under the Fourth Amendment, no warrant is required for the installation of a pen register. Since the states may give their citizens more protection from governmental intrusions than the federal government, *State v. Sarmiento,* 397 So.2d 643 (Fla. 1981), the defendants would have this Court extend the law in Florida to require a warrant for a pen register. In support, the defendants submit the law of California and the 1980 amendment to the Florida constitution on privacy rights.[1]

Defendants contend that the passage of Article I, Section 23 on privacy rights demonstrates that the State of Florida is prepared to recognize that one has an expectation of privacy of the phone numbers one dials and that the expectation of privacy is a reasonable one. Thus the defendants conclude that a search warrant should be required before a pen register is installed.

This Court disagrees with the defendants' position that a pen register amounts to a search requiring a warrant. The specific and non-obtrusive nature of a pen register is not such a severe intrusion into one's privacy. A pen register should only issue under court order for good grounds and only where necessary to achieve the desired end. Judge Scott was apprised of the need for the pen register and this court will not upset that finding.

Consensual Electronic Surveillance

Section 934 authorizes a police officer to intercept a conversation without a warrant if he secures the permission of one of the parties. In *State v. Sarmiento,* the Supreme Court of Florida held Florida Statute 934.03(2)(c) unconstitutional under Article I, Section 12 of the Florida constitution "insofar as that statute authorizes the warrantless interception of a private conversation *conducted in the home"* (emphasis in original).

The defendants ask this court on this motion to suppress to prohibit warrantless one party consent interceptions to a party's CPA office. Recently the Supreme Court of Florida "refuse[d] to extend the reasoning of *Sarmiento* and the protection of Art. I, §12 beyond the four walls of the home." *Hill v. State,* _____ So.2d _____ (Fla. #60.144 opinion filed July 15, 1982) [7 F.L.W. 324] If, as in *Hill,* a defendant's backyard is not considered a part of a home under *Sarmiento* then certainly a CPA office is not. The one party consent call to Ortega's office is lawful,

---

[1]It has been specifically held that pen registers are not governed by Chapter 934 because they merely record phone numbers dialed and do not intercept oral communications. *Armstrong v. Southern Bell Tel & Tel Co.,* 366 So.2d 81 (Fla. 1st DCA 1979).

because Ricardo Morales one of the parties to the call gave his permission for the intercept.

Prior Surveillance Disclosure

Chapter 934 is the most intrusive of all investigative techniques and as such must be strictly construed. *In Re Grand Jury Investigation,* 287 So.2d 43, 47-48 (Fla. 1973).

Section 934.09 specifically requires that each application for a wire intercept fully disclose all previous intercept applications involving any of the same persons, facilities, or places specified in the application. This requirement of disclosure is necessary "to implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *U.S. v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 1832 (1974).

This Court finds that the original wire intercept application for the telephone of Roberto Ortega on January 26, 1981, completely failed to mention that one of the persons sought to be intercepted, Carlos Quesada, had his telephone subjected to a wire intercept order in 1978, signed by a Judge of the Circuit Court of Dade County or that said subsequent interceptions were suppressed, even though this information was known to the affiant and the state at the time this application was presented to Judge Scott.

It should be noted that Sgt. Raul Martinez, the affiant on the 1978 application, is one of the chief investigators in this case and the immediate supervisor of the affiant in this case, Officer D. C. Diaz.

The Court finds that the Ortega wiretap applications of January 26, 1981, sought authorization to intercept the communications of "Roberto A. Ortega, Carlos Quesada, Alfredo Arias, Lucila Garcia, Rafael Villaverde, Raul Villaverde, Jorge Villaverde, Frank Condom, Ronald Condom, and other persons whose identities are unknown . . ." All of the subsequent applications named all these people as targets yet *none* even mentioned the Ortega application in paragraph 13, their "full and complete statement" of all prior applications.

It is the further finding of this Court that concerning the 1978 Quesada wiretaps, all the applications subsequent to Ortega contained the exact same three paragraphs:

> Your Affiant is aware of a previous Application, Affidavit and Authorization which resulted in an Order Authorizing Interception on telephone number (305) 858-5937, registered to Carlos F. Quesada at 1724 Southwest 16th Street, Miami, Dade

County, Florida, signed by the honorable David L. Levy on February 10, 1978, with interception subsequently commencing by members of the City of Miami Police Department.

Your Affiant is also aware that Carlos F. Quesada was named in an Application, Affidavit and Authorization on telephone number (305) 821-0694 registered to Oscar Oliva-Cantu at 17500 Northwest 68th Avenue, Apartment #302, Dade County, Florida, for which an Order was signed on March 31, 1978, by the Honorable David L. Levy.

Those interceptions resulted in the subsequent indictment of Quesada and others by the federal government for narcotics violations. Subsequent to his indictment, Carlos F. Quesada was given use immunity by the United States government for his testimony about his activities between December, 1977, and September, 1979. The indictment against Quesada was, therefore dismissed.

This Court finds none of the subsequent applications mentioned the March 10, 1978 application and order for the extension of the interception of the communications of Carlos Quesada on a telephone located at 1724 S.W. 16th Street, or the April 29, 1978, application for the extension of the interception of the communications of Carlos Quesada on a telephone registered to Oscar Oliva-Cantu. Both of these applications were made by Sgt. Raul Martinez upon the authorization of State Attorney Janet Reno.

Furthermore, none of the subsequent applications mentioned the suppression of the 1978 interceptions by Judge Ferguson or the recommendation of suppression by a United States Magistrate. In fact, the disclosure gives the false impression that prosecution emanating from the 1978 interceptions was solely in federal court and was successful.

This Court finds the failures of full disclosure in the subsequent applications do not stop here. Careful reading of the individual applications reveal the following:

—the February 27, 1981, application for 856-4441 contains no mention of the simultaneous but separate application to intercept the same exact people on 856-2127;

—the March 27, 1981, application for the first extension on 856-4441 contains no mention of the simultaneous but separate extension application to intercept the exact same people in 856-2127;

—the April 25, 1981, application for an extension on 856-3290 contains no mention of the simultaneous but separate second extension application to intercept the exact same people on 856-2127; and

—the April 25, 1981, application for a second extension on 856-2127 contains only the following cryptic paragraph with regard to the applications for interceptions on 856-4441:

> To the knowledge of your Affiant, a previous Application has been made to a Judge for an Order Authorizing the Interception of Wire or Oral Communications regarding Carlos F. Quesada at 1724 Southwest 16th Street, Miami, Dade County, Florida. To the knowledge of your Affiant, with the exception of this Court's Orders of February 27, 1981, and March 27, 1981, no previous Applications have been made to any Judge for an Order Authorizing the Interception of Wire or Oral Communications regarding telephone number (305) 856-4441 or (305) 856-2127, or to 2 Grove Isle #1102, Miami, Dade County, Florida.

Among other things, absolutely no mention is made of all the other people named and targeted for interception in the prior 856-4441 applications.

This Court finds that in all these subsequent applications, the State Attorney's authorizations disclosed no more than the applications and, in fact, were little more than referrals to Officer Diaz' "full and complete statement".

With regard to the disclosure of previous intercept applications the language is clear and unambiguous:

> (1) . . . Each application *shall* include the following information:
>
> *   *   *   *   *   *
>
> (e) A full and complete statement of the facts concerning *all previous applications* known to the individual authorizing and making the application, made to any judge for authorization to intercept . . . wire . . . communications involving any of the same *persons, facilities, or places specified in the application,* and the action taken by the judge on each such application. . . .

Section 934.09, Florida Statutes; 18 U.S.C. §2518 (emphasis added).

Only two appellate courts in the State of Florida have considered the issue before this court, the omission of a "full and complete statement" of "all previous applications", and both have held that a failure to make

this disclosure requires suppression. *Bagley v. State,* 397 So.2d 1036, 1038 (Fla. 5th DCA 1981); *State v. Aurilio,* 366 So.2d 71, 76 (Fla. 4th DCA 1978), *cert. denied,* 376 So.2d 76 (Fla. 1979).[2]

In *Aurilio,* the State contended that suppression was not the appropriate remedy for non-compliance of the Section 934.09(1)(e) directive. *State v. Aurilio, supra* at 75-76. The Fourth District flatly rejected the State's position that failure to disclose prior wiretaps does not play a "substative role" in the authorization process. *Id.* at 76.

> [W]e cannot help but feel that a judge's decision to issue a wiretap authorization would be seriously affected by the disclosure of the details or previous wiretap applications. In other words, a judge may well deny an application knowing previous wiretaps have failed or that past applications have been denied or knowing other similar pertinent information.

The case before this Court offers a striking example of the necessity of disclosure of prior wiretaps. For *thirteen* times in three years the same police squad sought the court's authorization to secretly intercept the private conversations of the same individual, intentionally withholding from the court the history of the four previous interceptions in 1978.

The question is not whether Sgt. Martinez or his men fabricated anything in 1978 or now. The question is only one of disclosure, of compliance with the requirement of a "full and complete statement of the facts concerning all previous applications . . . involving any of the same persons" so the judge, *not* the police or the prosecutor, can properly assess the statements of probable cause and the investigative necessity of more electronic surveillance. A judge may authorize the intercept order after a full disclose or he may very well refuse authorization believing these particular officers irresponsible and overzealous in their continued quest for Carlos Quesada. It is speculation now, however, since this pertinent information was deliberately withheld from Judge Scott.

Furthermore, this Court finds no mention was ever made of the extent of the intrusions in 1978, namely that there were *four* separate applications and orders not just the two mentioned. A major purpose

---

[2]Decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by the Supreme Court of Florida. *Stanhill v. State,* 384 So.2d 141, 143 (Fla. 1980). A trial court is obligated to follow the dictates of a decision of a district court outside of its district until told otherwise by its own district or the supreme court. *Dillon v. Chapman,* ____ So.2d ____ (Fla. 5th DCA 1981) [1981 F.L.W. 1869]; *Holmes v. Blazer Financial Service, Inc.,* 369 So.2d 987, 988 (Fla. 4th DCA 1979); *State v. Hayes,* 333 So.2d 51, 52 (Fla. 4th DCA 1976).

behind the disclosure requirement is to provide the issuing court with a true and total picture of the nature and extent of all prior electronic intrusions by government.

Since this information was deliberately withheld from Judge Scott, this ground alone demands suppression.

Minimization

Another issue raised by the defendants is that the intercepted conversations were not minimized as required by Florida Chapter 934. In this case the Court finds that the interceptions were conducted with reasonable effort to restrict the interceptions to criminal calls only (drug related). Of course one must listen to a small portion of a conversation to detect whether it is drug related or not. This court finds that the minimization requirement was met in light of *Scott v. U.S.,* 436 U.S. 128, 98 S.Ct. 1717 (1978), the reasonableness test adopted by the Supreme Court.

Break In and Failure to Particularize

The defense maintains that the evidence derived from the room bug in Carlos Quesada's house must be suppressed because of the surreptitious entry used to install the bug and due to the failure of the order to specify where in the house the bug was to be placed.

The first contention is unfortunately without merit. The Supreme Court in *Dalia v. U.S.,* 441 U.S., 238, 99 S.Ct. 1682, 1688-1692 (1979) specifically held that Title III authorizes the use of a surreptitious entry in order to install a bug and that Congress clearly understood it was conferring power upon the courts to authorize surreptitious entries when it enacted Title III. Similarly, the Florida Statute, patterned after Title III, also contemplates surreptitious entry for installation of room bugs. Therefore, no constitutional or statutory rights were violated.

The second failure to particularize did not violate anyone's rights. The room bug was installed in perhaps the least intrusive room in the house—the living room. It was not placed in a bathroom or a bedroom. The failure to particularize did not result in abuse.

Authorized Objectives and Attainment of Authorized Objectives

Another issue raised is that the authorized objective was so vague so as to be the equivalent of a general warrant. The objective of this interception was somewhat open-ended, but this is in the very nature of a conspiracy. An important part of the objective is to learn of "others yet unknown" involved in this drug conspiracy. One co-conspirator cannot preclude the use of evidence acquired through a wiretap merely by pointing to the abundance of probable cause already in existence to arrest others. *State v. Carney,* 407 So.2d 340 (Fla. 4th DCA 1981). So

long as there were other participants whose identities were not yet known, the interceptions were lawful despite arrests made as to other defendants.

Amendment

The amendment on the telephone number however is a separate matter. During the wiretap, the telephone subscriber received a new phone number. The state amended its application to tap 856-3290 instead of 856-4441. The amendment did not comply with the statutory requisites because it failed to adequately state probable cause for tapping the new line. Therefore all evidence derived from the amendment is suppressed.

In support of their motion to suppress, defendants rely on *Wilson v. State,* 377 So.2d 237 (Fla. 2nd DCA 1979). *Wilson* is distinguishable on its facts. In that case, the amendment was for a new telephone number and a new address. The court suppressed the evidence reasoning that there had been no showing that normal investigative techniques would fail at the new address. Here there is only a request for a change of phone number. Therefore the rationale of the *Wilson* case is inapplicable.

The state is correct in its statement that the statute does not require that a specific telephone number be identified in the application. *U.S. v. Feldman,* 606 F.2d 673 (6th Cir. 1979). However, the state, on its own, has chosen to identify its wiretaps according to phone numbers. Assuming that there was probable cause to tap 856-4441, it cannot be also assumed that the alleged criminal activity would continue on 856-3230 without a renewed showing of probable cause. *Calhoun v. State,* 34 Md. App. 365, 367 A.2d 40 (1977). It cannot be taken for granted that the activity on 856-3230 is a continuation of 856-4441.

The alleged reason for the amendment application was that the subscriber requested a new phone number. This does not provide probable cause to believe that there is a need to tap the new phone. On the contrary, the request for a change of phone number may very well indicate that the subscriber no longer wants to be contacted by his alleged co-conspirators.

This court finds that there was no showing of probable cause to believe that 856-3230 would be used for narcotics transactions. The amendment application seriously falls short of the statutory requirements of 934.09. Therefore all evidence derived from the wiretaps on 856-3230 is hereby suppressed. *United States v. Giordano,* 94 S.Ct. 1820, 1832 (1974).

Delivery, Storage and Sealing

This Court finds that the defense is correct that the statute was not strictly complied with in regard to post-intercept procedures. However, there is no authority to support the contention that the remedy for lack of strict compliance with post-intercept procedures is suppression. *Hicks v. State,* 359 So.2d 475 (Fla. 1st DCA 1978). Suppression is required only for those violations that play "a central or even functional role in guarding against unwarranted use of wiretapping or electronic surveillance". *United States v. Chavez,* 416 U.S. 562, 578, 94 S.Ct. 1849, 1857 (1974). Post-intercept violations do not require suppression.

However, this is another example of the state's failure to strictly follow the provisions of Chapter 934.

State Attorney Subpoenas

The defense argues that the subpoenas duces tecum issued by the State Attorney to Southern Bell without judicial authorization violates the defendants privacy rights. A subpoena is not a search warrant and it need not be issued by a detached magistrate. All that is required is that the subpoenaed materials be relevant to the investigation being conducted and that the subpoenas not be overly broad or burdensome." *State v. Tsavaris,* 394 So.2d 418, 426 (Fla. 1981). In *Tsavaris,* the state subpoenaed a psychiatrist's records on a patient without court order. Although the court is aware that a record of phone numbers dialed may provide a "virtual current biography" of the subscriber, it is certainly not more intrusive than psychiatric records.

A subpoena duces tecum is much less intrusive than a search warrant and does not require issuance by a detached magistrate. The state attorney issued a request for toll records in connection with a pending criminal investigation. The information was used for the investigatory activity. The use of the subpoena was properly limited in scope, relevant in purpose and specific in directive so that compliance did not violate defendants' rights.

Additional Offenses

The defense also raises the illegality of overhearing conversations relating to crimes other than those mentioned in the application.

In *People v. Calogero,* 446 N.Y.S.2d 615, 84 A.2d 667 (1981), wiretapping was authorized for gambling criminal activity. The police inadvertently heard of violations of election laws. The court held that if the tap for gambling was inadvertently overheard (analogous to the plain view doctrine) then it was valid. As the 10th Circuit said in *United States v. Cox,* 449 F.2d 679 (10th Cir. 1971) *cert. den.,* 406 U.S. 934 (1972):

> It would be irrational to hold that officers authorized to listen to conversations about drug traffic, upon learning that a bank robbery is to occur, must at once close down the project . . .

This court determines that the conversations involving additional offenses inadvertently overheard do not violate the statute.

Third Tape Recorder

Chapter 934 specifically speaks of two tape recordings of intercepted communications. §934.09(7)(a) speaks of the importance that the tapes be in proper custody. The statute dictates that the tapes shall not be destroyed except upon court order and in any event shall be kept for ten years.

In this case, the Court finds, the police took the liberty to run a third tape recorder. Not only was Judge Scott never made aware of the third tape recorder but also no authorization was ever sought to erase this tape. The taping and erasing of a third tape without judicial authorization was a deliberate blatant disregard of Chapter 934. Although these violations may not in and of themselves mandate suppression, this adds to the overall disregard for strict compliance with the statutory scheme of the wiretap that is evident in this case. This Court finds from the testimony that it was possible for this third recorder to record intercepted conversations by itself without the two authorized recorders recording conversations.

Whether or not other conversations were recorded in this manner solely by this third recorder and then destroyed we will never know.

Polygraph Test

The defense also raises as an issue to suppress the wiretaps, the use of polygraph results as part of the intercept application. The courts of this state do not consider the results of polygraph tests because they are unreliable. They are not admissible in evidence. *Sullivan v. State,* 303 So.2d 632, 634 (Fla. 1974), *cert. den.,* 428 U.S. 911, 96 S.Ct. 3226 (1976).

It is interesting to note that after obtaining information from the informant Ricardo Morales that makes up the initial application for the Ortega intercept, the police took this information to William Richey, Chief Assistant State Attorney in the Dade County State Attorney's Office, for the purpose of receiving an authorization for a court ordered wire intercept. However, Mr. Richey would not sign an authorization based upon Morales' uncorroborated information and suggested that Morales be given a polygraph examination. After allegedly "passing" this examination (and the court has serious doubts as to this all encompassing

statement after hearing testimony at the supression hearing—it appearing to the Court that on at least one key question the examiner was of the opinion that Morales was not truthful) the authorization was signed.

It is incredible to this Court that the State Attorney's Office would do nothing more to corroborate the information of the informant than to administer a test that the courts of this state refuse to recognize because of its inherent unreliability. This matter becomes crucial as we next consider the issues of exhaustion and *Franks v. Delaware.*

Exhaustion and Exhaustion of Alternative Techniques
and *Franks v. Delaware*

This Court finds that the original wire intercept application for the Ortega telephone was based upon the uncorroborated information supplied to Det. D. C. Diaz and Sgt. Raul Martinez of the City of Miami Police Department by Ricardo Morales a/k/a "The Monkey". Morales spent many hours with these officers and told them stories concerning numerous targets of this investigation and about alleged drug dealing and other alleged violations of the law. No one connected with this investigation made any effort to corroborate his information, with one exception. A controlled telephone call was placed to Roberto Ortega early in the investigation that indicated that Ortega might be able to supply cocaine to Morales. But a subsequent controlled call, made shortly before the first application was presented to Judge Scott, between Ortega and Morales showed that Ortega could not get cocaine because his source of supply had been ᐧcut off. No other piece of information was verified by the police or state prior to approaching Judge Scott with the Ortega application.

This Court finds that simple investigative techniques that are standard police procedure were not used to test the reliability of Morales' information even though the investigation for the state had to admit that Morales' information had to be rigidly scrutinized. He was a man known to the police to sell his services to the highest bidder. He was a man highly suspect amongst the law enforcement community of South Florida. This information concerning the background of Morales was known to the affiant D.C. Diaz prior to January 26, 1981, the date he first presented his application to Judge Scott.

However, the Court finds that none of this information concerning the failure to use even the simplest of conventional investigative techniques to corroborate the information of Morales or any of the information concerning his background was ever revealed to Judge Scott.

It is obvious to this Court and the Court so finds from all the testimony at the suppression hearing that from the beginning of this

investigation the only thing that interested the police was getting a wire intercept order and they never intended to use conventional investigative techniques to see if they could "make a case" prior to having to resort to Chapter 934. Apparently the police must have felt that it is much easier to sit and listen to telephone conversations in a hotel room than it would be to conduct the type of investigation that should properly be conducted before applying for an intercept order under Chapter 934.

The Court further finds that the police officers from January 26, 1981, the date of the first wire intercept order, until the termination of all court ordered wire and oral interceptions made very little effort to carry out any of the investigative requirements of Chapter 934.

The statutory requirement of 934.09(1)(c) that normal investigative procedures be exhausted prior to application for a wiretap order must be reviewed in a practical and common sense fashion. The statute does not require that every imaginable method of investigation be employed. *Cuba v. State,* 262 So.2d 29 (Fla. 3rd DCA 1978), but neither can the wiretapping be an initial step in the criminal investigation. *See U.S. v. Kahn,* 415 U.S. 143, 94 S.Ct. 977 (1974).

The defendants argue that the applications contain only boiler plate recitations as to why other techniques of investigation failed or would fail. They claim that these allegations in the affidavit are not based on the facts of this case but upon the police's experience in other drug conspiracy operations, and the Court finds that they are correct.

This court is aware of the difficulties involved in investigating a conspiracy. However this does not obviate the requirement that there be a good faith effort to assemble sufficient evidence before resort is made to wiretapping. The affidavit must show an adequate factual history of the investigation sufficient to enable the judge to determine, *independently of an agent's assertions,* that other investigative procedures very likely will not succeed. The Court finds that this good faith effort was totally lacking.

Based upon the information supplied to Judge Scott, he may well have concluded that normal investigative techniques were exhausted. However, the problem in this case is that the judge was not fully apprised of all the circumstances of the case.

The language of the 9th Circuit in *United States v. Spagniolo,* 549 F.2d 705, 710-711 (9th Cir. 1977) is especially appropriate to the case at bar:

It is no doubt true that experienced agents at the outset of an investigation can anticipate with a fair degree of accuracy

whether ordinary techniques will fail or prove to be too dangerous. To delay the wiretap order while ordinary techniques are employed or *to undertake to educate a district judge* to enable *him* to appreciate their level of experience no doubt appears to such agents to be a waste of time and resources. Their preception may be accurate, but Congress has deprived it of decisive influence. The particularized showing [ ] is necessary. The district judge, *not the agents,* must determine whether the command of Congress has been obeyed.

This court finds that Judge Scott was not fully informed of the facts and circumstances underlying this investigation. The police have a duty to thus inform the judge so that he himself could make the determination as to whether the statute was complied with.

It is also important to note, and the Court so finds, that after the first wiretap was initiated, Detective Diaz' testimony shows that the police did not resort to "conventional investigative techniques". In sum, the state listened to and believed everything Mr. Morales had to tell them. The information supplied by Mr. Morales was not verified by independent police investigation. This is especially fatal to the issue of exhaustion because the police knew that Mr. Morales had good reason to be less than objective with information he provided to the state. *Cf. United States v. Hyde,* 574 F.2d 856, 863 (5th Cir. 1978). Simple police investigatory practices were not even tried. Information could have been verified for example by a trip to the Opa-Locka airport, a call to a maintenance manager in a building, a flip through the pages of the telephone directory. This is not a situation where "defense lawyers [. . .] suggest[ed] post factum some investigative technique that might have been used and was not." *Hudson v. State,* 368 So.2d 889, 903 (Fla. 3d DCA 1979).

This issue of exhaustion is intricately connected with the omissions and misrepresentations that occurred in obtaining the wiretaps. The defendants contend the applications for wiretaps contained misleading statements and misrepresentations.

*U.S. v. Hyde* set forth the standard which must control in assessing whether the affidavits and therefore the orders containing the misrepresentations are valid. Two situations would require invalidation:

1. If the misrepresentation was committed with an intent to deceive the magistrate, whether or not the error is material to the showing of probable cause, or

2. If the misrepresentation was non-intentional but is material to the establishment of probable cause. *U.S. v. Hyde,* 574 F.2d 856, 865

(5th Cir. 1978) *quoting United States v. Thomas,* 489 F.2d 664 669 (5th Cir. 1973), *cert. den.,* 423 U.S. 844, 96 S. Ct. 79 (1975).

In this case, the Court finds Judge Scott was not given all the facts concerning the sordid background of Morales. He was not told of Morales' involvement in the murder of 76 persons in a bombed Cuban airliner or about the numerous other bombings he committed. He was not told that Mr. Richey of the State Attorney's Office would not believe anything Mr. Morales said until he passed a polygraph exam. There were so many other facts that were not told to Judge Scott that they are too numerous to mention but appear throughout the record. If the state was to hang their entire case upon one man's word, the judge should have been fully informed of every fact that could bear on his creditability and reliability. It was for the issuing judge to decide whether to believe this man and it was for the police to give the judge every fact to enable him to do so. The statute assumes that there will be candor before the magistrate. In this case is was woefully lacking.

Nonetheless, in an attempt to save its prosecution, the state argues that the spirit, if not the letter of the statute has been satisfied here. The state asserts that there is no reason to apply the drastic remedy of suppression to correct technical defects which in no way undercut the purpose of the statute or infringes on the rights of the individuals involved. This argument must fail because this court rejects its underlying premise. The requirements of Chapter 934 are not mere technicalities; they are at the heart of the legislative scheme. Wiretapping is the ultimate in governmental intrusion into the private lives of every citizen. Only strict compliance ensures its constitutionality. Had the legislature not intended absolute compliance, ordinary search laws would suffice and there would be no need for Chapter 934.

We are not concerned just with the rights of these defendants. Chapter 934 was enacted to protect the general public from abuse of the awesome power of electronic surveillance. It is with great reluctance that this Court suppress the fruits of these wiretaps. A thorough and expensive investigation is in effect washed down the drain as it is quite clear that Judge Scott was not made aware of these infirmities when he signed the intercept orders.

The Legislature did not mean to hamstring law enforcement when it enacted Chapter 934. Rather, it believed that the technology available to organized crime made properly supervised electronic surveillance essential. But proper supervision is the key. For some reason, unknown to this court, the highest law enforcement officials in this County felt that they could ignore an express command of the Legislature. Needless to say, they cannot.

The reasons set forth in this section alone demand suppression.

Concern for the evils of crime is increasing in the United States, and not without justification. However, in such times it is especially important that the law not be bent in the name of expediency especially not by the government. The words of Justice Brandeis, written more than fifty years ago, sound a warning which must be repeated:

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

Olmstead v. United States, 1928, 277 U.S. 438 485, 48 S.Ct. 564 575, 72 L.Ed. 944 (Brandeis, J., dissenting).

Inventory

Defendants assert that the State failed to serve them notice as required by Florida Statute, Section 934.09(7)(e). The purpose of the notice requirement is to afford each defendant the opportunity to move to suppress the evidence. Since each defendant has moved to suppress the failure to comply with the notice requirement, if any, was without prejudice to any defendant. Therefore, the motion to suppress on this ground is without merit.

Standing—Ortega Wire Intercept

Standing to challenge intercepted communications is governed by Section 934.09(9)(a). Any "aggrieved person" may move to suppress the contents of an unlawfully intercepted communication or evidence derived therefrom. An "aggrieved person" is "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed". *See Florida Statute,* Section 934.02(9).

In *Alderman v. United States,* 394 U.S. 165 89 S.Ct. 961 (1969), the Supreme Court of the United States held that suppression can only be

obtained by those persons whose rights were violated by the search itself which in a wiretap situation would be those persons whose conversations were intercepted or whose premises were the site of electronic surveillance. *U.S. v. Scasino,* 513 F.2d 47 (5th Cir. 1975), the Fifth Circuit noted the *Alderman* footnote 9 stating that the legislative history of the wiretap statute intends to reflect the existing laws of standing in wiretap cases. *State v. Albano,* 394 So.2d 1026, 1030 (Fla. 2d DCA 1981) recognized that only those who were a party to an intercepted conversation or whose property was intercepted have standing to challenge an illegal wiretap.

In this case, the Ortega tap is illegal. The only defendants that have standing to challenge the wiretaps are those who were named on the application, overheard on the interception or the owner of the tapped premises.

| Named | Intercepted |
|---|---|
| Carlos Quesada | Barry Woodell |
| Alfredo Arias | Bernardo Garcia |
| Rafael Villaverde | Allen Sales |
| Frank Condom | Miguel Fernandez |
| Raul Villaverde | Victor Angulo |
| Jorge Villaverde | Louis Caporasso |
| Lucila Quesada | James Hunter |
| Roberto Ortega | |

Only these individuals have standing to challenge the Ortega tap.

Standing of Frank Castro

Except for Frank Castro, all defendants that were known at the time the application came before Judge Scott were named in the application. "Frank" was not, at that time, known to be Frank Castro. During the suppression hearings, Officer Diaz testified that "Frank" was Frank Castro. Therefore Frank Castro has standing to challenge all wiretaps upon which he was later identified as "Frank Castro".

All Wire Intercepts Subsequent to Ortega Tap—Standing

The defendants overheard on the taps after the January 26, 1981, Ortega tap have moved to suppress the evidence as being tainted by the prior illegal Ortega tap.

The defendants' challenge is that the evidence supporting the affidavits on the subsequent taps, after excising the illegally obtained evidence from the Ortega tap, is insufficient to show probable cause. *Neary v. State,* 384 So.2d 881, 884 (Fla. 1980).

This Court agrees that the evidence to support the subsequent taps were not "sufficiently distinguishable [from the initial illegality] to be purged of the primary taint". *Shapiro v. State,* 384 So.2d 711, 712 (Fla. 3rd DCA 1980) *quoting Wong Sun v. United States,* 371 U.S. 471 488 83 S.Ct. 407, 417 (1963).

In *United States v. Scasino,* 513 F.2d 47 (4th Cir. 1977), the Fifth Circuit addressed the issue of whether a defendant with no standing to challenge a first illegal wiretap has standing to seek suppression of evidence obtained from a second wiretap for which the first wiretap provided probable cause. The court, citing *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961 (1968) noted that the legislative history of the wiretap statute intends to reflect the existing law of standing. "Under prestatutory Fourth Amendment law, one does not have standing to suppress an illegal wiretap unless his conversations were overheard or the conversations occurred on his premises." *United States v. Scasino,* 513 F.2d at 50. *See Alderman v. United States,* 394 U.S. at 175. Consequently, only those defendants whose rights were violated by the first illegal tap have standing to challenge the second wiretap's derivative evidence

However, the Court finds that all defendants in this case have standing for the following reason.

Standing to Challenge the Failure to Exhaust
Normal Investigative Techniques

Every application for a wire or oral intercept after the initial hook up of the Ortega wire on January 26, 1981, failed to meet the strict requirement of Florida Statute, Section 934.09(1), namely that each application for an order *shall* include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." An issuing judge cannot be informed of the necessity of a wiretap where general conclusory statements are substituted for specific facts. After hearing the testimony of Officer Diaz, this Court finds that from January 26, 1981, until the end of this investigation, the police obtained one wiretap after another without making any other attempts to gather evidence by normal investigative techniques.

Therefore, every defendant overheard or named on any of the four wiretaps or the room bug has standing to challenge the evidence derived from that tap. Understanding *Alderman* analysis, these persons are "aggrieved" within the meaning of the wiretap statute, Chapter 934.

This Court further finds that all of the wire and oral interceptions that took place in connection with this case that were developed from

the original, illegal and tainted Ortega intercept and are therefore also tainted as fruit of the poisonous tree and are also suppressed for that reason. Therefore, all those defendants that had standing to contest the Ortega tap also have standing to contest all of the subsequent wire and oral interceptions.

This investigation taken in its totality, demonstrates that the police wanted a wiretap to get Ortega and Quesada. In doing so, they blatantly disregarded the strict commands of the statute. This Court cannot ignore the failure to follow the letter or the spirit of the law.

This Court finds that it is unnecessary to comment on any other matters raised by the defendants, as they would have no further bearing on this Court's Order.

In light of the above findings of fact and conclusions of law, it is hereby

ORDERED and ADJUDGED that the Motions to Suppress are hereby GRANTED as to each and every wire and oral interception authorized in this case by Judge Scott.