**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Adriano Cristopher MATTONI,
Defendant-Appellant.**

**No. 82–1256
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Jan. 10, 1983.

Stephen M. Orr, Austin, Tex., for defendant-appellant.

Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, REAVLEY and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

## I.

Appellant Adriano Mattoni was convicted by a jury on three counts of conspiracy and aiding and abetting in the distribution of LSD in violation of 21 U.S.C. §§ 841(a) and 846 and 18 U.S.C. § 2. Mattoni was sentenced to five-years imprisonment on two counts, the terms to run consecutively, plus a fine of $2,500 and a special parole term of five years. Mattoni timely appeals his conviction.

Because we find, after reviewing the record and the legal arguments presented, that no error was committed below, we affirm.

## II.

In recounting the evidence below, we are required to take the view most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Bound by this standard there is certainly substantial testimony and other evidence which supports the following version of the facts.

In December 1981 Troy Braswell, a criminal investigator with the Texas Department of Public Safety, and a fellow investigator, Hooper, met Curtis Joe Stacey at an Austin, Texas bar where Stacey was employed as a bartender. Stacey showed Braswell a small piece of hashish and indicated that more was available. They exchanged telephone numbers and agreed to meet at a later date.

Several days later Investigators Braswell and Hooper again saw Stacey in a local cafe where his girl friend worked. Stacey told Braswell that his connection in the hashish market was running low and asked if he was interested in LSD. The price discussed was approximately $1.25 to $1.35 per dosage unit of LSD, depending on the quantity ordered.

On January 4, 1982, Investigator Braswell called Stacey and told him that he was interested in buying 1,000 or 2,000 "hits" (single dosages) of LSD. Stacey told him that he would contact his source and call the next morning. The following morning Stacey called Braswell and asked him to meet with him. Braswell, and Hooper, met Stacey as planned. Braswell informed Stacey that he did not want to front the money necessary to purchase the LSD but Stacey replied that his source would not meet him because his source was "hot", and he asked the investigator to give him the money and wait at a nearby convenience store until he returned with the LSD. Stacey left the keys to his car with Braswell, took $1,150, and within fifteen minutes returned with a 1,000 dosages of LSD.

One week later Braswell negotiated for a second purchase of 5,000 hits of LSD. Hoping to discover Stacey's source, Braswell went with Stacey to the apartment complex where Mattoni lived. Mattoni came out of his apartment and told Braswell that he did not want to meet with him and that if he wanted 5,000 hits of LSD he would have to trust Stacey with the money. Mattoni,

however, subsequently changed his mind and decided to deal directly with Braswell. Arrangements were then made between Braswell and Mattoni to complete the 5,000-hit transaction the next day.

The following day Braswell and Hooper went with Stacey to Mattoni's apartment. Mattoni stated that he was "very hot" in the Austin area and that a Drug Enforcement Administration (DEA) Agent had been in his apartment several weeks earlier wanting to purchase a large quantity of LSD. Mattoni told Braswell that he would not directly hand him any drugs because he did not trust him. The meeting closed with Mattoni saying that he would contact Stacey the next day regarding further arrangements.

The next day Stacey contacted Braswell and they went to Mattoni's apartment. Mattoni would not hand the LSD to Braswell, but Braswell watched as Mattoni handed the LSD to Stacey. Braswell and Stacey then completed the deal.

The third and last purchase of LSD from Mattoni was made a week later on February 2, 1982, for 7,500 hits at a price of $5,100. Because Mattoni still did not want to hand the drugs to Braswell personally and receive the money, Stacey gave partial payment to Mattoni and brought the LSD to Braswell. As Stacey waited for the remainder of the money to take to Mattoni, the officers arrested him and Mattoni. When arrested, Mattoni had in his hand the $2,100 that Braswell had just given to Stacey.

On February 11, 1982, Mattoni was indicted for conspiring with Stacey (who subsequently pleaded guilty) to possess LSD with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. Mattoni was further charged in two substantive counts with aiding and abetting Stacey in the distribution of a large quantity of LSD in violation of 18 U.S.C. § 2. Mattoni was tried and convicted by a jury on all three counts and subsequently sentenced to imprisonment for a total of ten years together with a five-year special parole term and a fine of $2,500. He filed a timely appeal with this court.

## III.

On appeal Mattoni contends that the district court misstated the law in one of its jury instructions, erred in permitting the government's attorney to put the co-conspirator's guilty plea before the jury without giving a cautionary instruction, and violated his fifth amendment rights by denying the motion to suppress incriminating post-arrest statements.

### A. Jury Instruction

At the close of all the evidence, Mattoni requested that the trial court instruct the jury on the defense of entrapment. The government took the position that the defense of entrapment had not been sufficiently raised. In the event that the court chose to instruct on entrapment, however, the government, in response to repeated attacks during trial on the conduct of its agents, requested an instruction defining the legal responsibility of law enforcement officers. The court gave both instructions—the entrapment defense requested by the defendant and the contested instruction on the legal responsibility of law enforcement officers.

The contested instruction is as follows:

Testimony has been introduced in this case indicating that government agents have made repeated contacts with persons believed to be promoting, managing, establishing, or carrying on the unlawful business of selling LSD. You are instructed that this behavior on the part of the agents is not improper.

It is the duty of these agents to enforce the acts of the United States Congress and the State of Texas relating to the control of controlled substances. It is similarly their duty to vigorously pursue those involved in such enterprises. In order to faithfully effect their lawful arrests, the agents are entitled to use such force as is reasonably necessary to accomplish their tasks under the circumstances before them.

Also, these agents had a right to assume other identities, change their character, make offers to sell or provide controlled substances, *as long as their behavior does not induce an otherwise innocent person to commit the illegal act charged.* (emphasis added).    ·

Mattoni complains that this charge eliminates one of the separate and crucial issues in the law of entrapment—the appropriateness of government activities—from consideration by the jury. He asserts that, by charging the jury that repeated contacts by government agents with persons believed to be involved in the business of selling LSD was not improper, the court denied him a fair evaluation of the entrapment defense.

■ The contested instruction is similar to ones approved in *United States v. Pool,* 660 F.2d 547, 557 (5th Cir.1981) and *United States v. Fera,* 616 F.2d 590, 596–97 (1st Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980). The instruction was given in response to the defense of entrapment and was a proper statement of the law. *United States v. Russell,* 411 U.S. 423, 432, 434–36, 93 S.Ct. 1637, 1643–45, 36 L.Ed.2d 366 (1973). Accordingly, this contention of appellant is without merit.

### B. Co-conspirator's guilty plea

Mattoni next contends that the district court erred in permitting the government to put his co-conspirator's guilty plea before the jury without giving a cautionary instruction.

A review of the record shows that Curtis Joe Stacey, Mattoni's co-conspirator, was the first prosecution witness. He testified that he was arrested for delivering LSD to Agent Braswell and that he agreed to testify against Mattoni in exchange for dropping three of the four charges against him. He testified about his drug dealings with Mattoni which eventually led to the arrest of both of them. No particular emphasis was placed on the fact that Mattoni and Stacey were charged jointly.

Appellant admits that he made no objection to the introduction of the guilty plea.

He thus asks us to invoke the "plain error" doctrine Fed.R.Crim.P. 52(b) which provides that "[p]lain error or defects effecting substantial rights may be noticed although they were not brought to the attention of the court."

■ Since appellant made no objection, we may consider the contention now only if the admission of Stacey's guilty plea seriously affected the substantial rights of the accused. *United States v. Miranda,* 593· F.2d 590, 594 (5th Cir.1979). In making this determination, we must consider several factors in evaluating the impact of the witness's guilty plea: 1) the presence or absence of a limiting instruction; 2) whether there was a proper purpose in introducing the fact of the guilty plea; 3) whether the plea was improperly emphasized or used as substantial evidence of guilt; and 4) whether the introduction of the plea was invited by defense counsel. *United States v. Black,* 685 F.2d 132, 135 (5th Cir.1982) *citing United States v. Fleetwood,* 528 F.2d 528, 532 (5th Cir.1976).

In the instant case, the district court instructed the jury that "the fact that an accomplice has entered a plea of guilty to the offense charged is not evidence in and of itself of the guilt of any other person." Stacey was called by the government, and the guilty plea was brought out on direct examination. The government claims that the sole purpose for eliciting this testimony was to blunt the impact of anticipated attacks by the defense on Stacey's credibility or on the honesty of the government in its dealings with him. The defense did not object to this testimony but attempted to impeach Stacey's testimony by vigorous cross-examination of Stacey on the plea agreement and then by mentioning it in closing argument. There was no undue emphasis or attempted use of the plea as substantive evidence of guilt.

■ In view of the court's limiting instruction and of the presence of several of the other *Fleetwood* factors—a proper purpose underlying introduction of the guilty plea and a lack of undue emphasis or attempted use of the plea as substantive evi-

dence of guilt—we conclude that admission of Stacey's guilty plea did not substantially affect Mattoni's rights and that the district court did not abuse its discretion in admitting the testimony. *United States v. Black,* 685 F.2d at 135.

### C. *Suppression of Post-Arrest Statements*

Finally, Mattoni contends that the district court erred in denying his motion to suppress all post-arrest statements since these statements were incriminating and were given to the arresting officers as a result of custodial interrogation.

Mattoni admits that he was informed of his *Miranda* rights, before any incriminating statements were made, but he argues that the statements were not admissible because he was "under interrogation." The record reveals that Mattoni stated that he understood his rights on at least two occasions. Once *Miranda* rights have been given, it is for the individual to indicate in any manner and at any time, prior to or during the question, that he wishes to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966); *United States v. Rice,* 652 F.2d 521, 537 (5th Cir.1981). Mattoni did not exercise his right to silence until later when he refused to cooperate in the investigation of Ray Roy Massry, his source. His exercise of his fifth amendment rights at that later time did not render involuntary any answers tendered before the privilege was invoked. *United States v. Rice,* 642 F.2d at 527. Clearly, he initially made an independent and informed choice of his own free will to respond to the interrogation of the officers, after being advised of his rights which he said he understood.

Having reviewed the record and having considered the legal arguments, we find that the district court did not commit error during the trial and that the verdict below is

AFFIRMED.