978 F.2d 881
 UNITED STATES of America, Plaintiff-Appellee,
v.
Milton Eugene ROBINS, Defendant-Appellant.
 No. 91-1850.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 20, 1992.
Rehearing Denied Jan. 5, 1993.
 
 1
 Melvyn Carson Bruder, Dallas, Tex., for defendant-appellant.
 
 
 2
 Joe C. Lockhart, Asst. U.S. Atty., Ft. Worth, Tex., John P. Lydick, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.
 
 
 3
 Appeal from the United States District Court for the Northern District of Texas.
 
 
 4
 Before JOLLY, and DUHE, Circuit Judges, and PARKER,* District Judge.
 
 
 5
 ROBERT M. PARKER, District Judge.
 
 
 6
 Defendant-Appellant Milton Eugene Robins (Robins) raises several points of error in this case--errors allegedly committed at the investigatory, pre-trial, trial and sentencing stages of the proceedings against him. We affirm on all points.
 
 I. Facts and Procedural History
 A. Trial Facts
 
 7
 The proceedings below uncovered the following facts.
 
 
 8
 In June, 1989, John Camiola (Camiola) was introduced to Drug Enforcement Agency (DEA) agents in Houston, Texas. These agents were operating an undercover, "reverse sting" operation, whereby they would sell marijuana to individuals (as opposed to buying it, thus the "reverse" nature of the operation). Camiola operated as a "broker," introducing prospective buyers of marijuana to the DEA agents and charging a fee for this service.
 
 
 9
 On November 14, 1989, Camiola introduced Robins to the agents. Several agents, Camiola and Robins proceeded to the farm where the agents kept marijuana for sale. After inspecting the marijuana available, Robins selected 618 pounds that he purchased. On the following day, the parties met to arrange for the transportation of the purchased marijuana. At that meeting, another purchase of marijuana was discussed when an agent showed Robins a sample of some marijuana that had not been available for his inspection the day before. Later in the day, Camiola, Tom Meigel (an associate of Camiola's) and Robins again met with the agents to pay for and to take possession of the 618 pounds of marijuana. The marijuana was loaded into a 1989 Ford pickup truck, which was delivered to Robins and then turned over to Neal Massey and Nona Harris. Several hours later, at the request of DEA agents, state law enforcement officials stopped the truck in Walker County, Texas, arrested Massey and Harris, and seized the marijuana.
 
 
 10
 On the following day--November 16, 1989--Camiola, Robins, and the DEA agents met again. The seizure of the truck in Walker County, Texas was discussed, as was the seizure's probable effect on the other prospective purchasers of marijuana who were "in town."
 
 
 11
 On November 17, 1989, Camiola and Robins accompanied agents to the farm where the marijuana was stored, and Robins selected 2,800 pounds of marijuana to be loaded on a trailer previously furnished to the agents. The parties agreed that the trailer full of marijuana would be delivered by the DEA agents to the buyer, at which time "more than half" of the cost of the marijuana would be paid. Delivery of the trailer and marijuana was delayed until November 20, 1989. The trailer was delivered to Robins, who in turn delivered it to his buyers.
 
 
 12
 Ultimately, the trailer was stopped in Fort Worth, Texas. And the marijuana was seized.
 
 
 13
 On June 1, 1990, DEA and other law enforcement agents searched Robins' residence in Van Zandt County, Texas, where they recovered numerous documents that were ultimately used to compute Robins' sentence.
 
 
 14
 In March 1991, Robins was tried in a joint trial with Glenn Ivan Allison and Kim Dee Kelly. Robins was charged with two offenses: (1) conspiracy to possess with intent to deliver more than 100 kilograms of marijuana (in violation of 21 U.S.C. § 841), and (2) aiding and abetting a co-defendant's possession with intent to deliver more than 1000 kilograms of marijuana (in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2). At trial, Neal Massey and Jack Vaughan testified that on occasions prior to November 1989, they participated in marijuana transactions at the direction of Robins.
 
 B. Appellate Posture
 
 15
 Robins raises the following points of error: (1) the district court erred by not properly instructing the jury as to the meaning of the term "agent" as used in the instructions given on the law of entrapment, thereby denying Robins the opportunity to have the jury decide whether he had been indirectly entrapped; (2) the district court erred in not granting Robins' motion for judgment of acquittal as to Count Two of the indictment (the aiding and abetting count) or his motion for a new trial because of the jury's variant verdict--acquitting the co-defendant allegedly aided and abetted by Robins on the same count on which Robins was convicted of aiding and abetting--which verdict rendered the evidence insufficient to sustain Robins' conviction for aiding and abetting that co-defendant; (3) the district court erred by not ordering the government to affirm or deny the existence of unlawful electronic surveillance at the residence of Robins, as required by 18 U.S.C. § 3504(a)(1)--there having been a claim that such activity occurred; (4) Robins was prejudiced by the comment of a co-defendant's counsel that "other people who were involved" had "decided to plead guilty"--inasmuch as the trial court failed to give the jury any curative, limiting instruction; and (5) the district court erred in computing the base offense level applicable to Robins, and thus that the court erred in sentencing him within the range of punishment prescribed by that base offense level.
 
 II. Analyses of Points of Error
 A. The Agency Instruction
 
 16
 A district court is granted broad discretion in fashioning jury instructions. The relevant question is whether there has been an abuse of this discretion by the district court. United States v. Johnson, 872 F.2d 612, 621-622 (5th Cir.1989).
 
 
 17
 For purposes of his entrapment defense, Robins requested that the district court give the jury this explicit "ignorant pawn" instruction:
 
 
 18
 paid informants and ignorant pawns of the government are both "agents" of the government for purposes of this instruction. An "ignorant pawn," of the government is a person who is controlled by or is acting at the direction of the government but who is unaware that the government is using him.
 
 
 19
 The district court refused, instructing the jury that:
 
 
 20
 Law enforcement officers are persons in the employment of federal, state, or local law enforcement agencies. Agents of law enforcement officers, for purposes of this instruction, include persons, such as paid informants, who act solely for or on behalf of actual law enforcement officers.
 
 
 21
 (emphasis added here) This instruction is essentially the one approved by this Circuit's 1989 Johnson case. Compare Johnson, 872 F.2d at 622. As Johnson made clear, the reference to "a paid informant" as an example does not mislead the jury or imply that others are excluded from the sphere of legally cognizable "agents." The district court committed no error in terms of its agency instruction. United States v. Sarmiento, 786 F.2d 665, 668 (5th Cir.1986) ("This circuit has not adopted the 'unsuspecting middleman' theory of entrapment").
 
 
 22
 B. Aiding and Abetting, Variance and the Joint Trial
 
 
 23
 Robins argues that the jury's acquittal of the principal defendant--Allison--on Count Two (charging Defendant Allison with possession of marijuana with intent to distribute, and charging Co-Defendants Robins, Darrell Preston Smith, and Kim Dee Kelly with aiding and abetting Allison's omission of that offense), worked such a variance of verdicts as to render the evidence necessarily insufficient to sustain Robins' conviction for aiding and abetting Allison. Robins thus contends that the district court erred in not granting Robins' motion for acquittal or his motion for a new trial. Some competing policy considerations make this an apparently close question. But for the following reasons, the better view is that displayed by the district court, and we accordingly affirm on this point as well.
 
 
 24
 Usually an indictment for aiding and abetting alleges that one aided and abetted a named principal "and unnamed, unknown others." In those cases, if the named principal is found innocent of committing the crime of which the principal is accused of committing and the accused aider and abettor is alleged to have assisted, there is no apparent variance between the acquittal of the indicted named principal and the indicted aider and abettor. Robins' case is unusual, in that the indictment returned by the Grand Jury against Robins read only that he aided and abetted Allison--and not that he aided and abetted anyone else, known and named or otherwise. Thus, there does exist an apparent variance between the jury's verdicts in this joint trial.
 
 
 25
 Robins contends that when Accused Principal Offender Allison was acquitted of the crime Robins was alleged to have aided and abetted, an essential element of the crime of aiding and abetting with which Robins was charged could not then be found in the government's case against Robins. Robins argues that to "presume" this element to have been found by the same jury in the aiding and abetting case against him--despite its "apparent rejection" of it in the underlying case against Principal Allison--amounted to an impermissible enlargement of the indictment against Robins by the district court (i.e., an enlargement of the indictment to one including unnamed, unknown principles). The government argues that the criminal jury principle of lenity, or "jury nullification" allows for a logical explanation for the apparent variance in verdicts--allowing for Robins' conviction of aiding and abetting Allison even though the jury acquitted Allison of the offense Robins is charged with having aided and abetted. The government has the better of the arguments.
 
 
 26
 The prosecution must prove each element of its case against any defendant beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). Our task on appeal is to determine whether, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found Robins guilty beyond a reasonable doubt of the essential elements of aiding and abetting Allison on Count 2. See e.g., United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). There was sufficient evidence by which the jury could have found Robins guilty of this offense. Moreover, the jury was properly instructed--under 18 U.S.C. § 2--to analyze the cases against Allison and Robins in distinction, and there is no reason to presume the jury did otherwise.
 
 
 27
 In short, we uphold Robins' conviction for aiding and abetting because: (1) there exists a reasonable possibility of a legitimate explanation for the apparent inconsistency in the jury's verdicts relative to Robins and Allison; (2) there exists otherwise sufficient evidence to support Robins' conviction (compare United States v. Upshaw, 685 F.2d 1202, 1204 (9th Cir.1982) (per curiam)); and (3) accordingly, the jury's conviction of Robins must not be upset by our speculation. Dunn v. United States, 284 U.S. 390, 394, 52 S.Ct. 189, 191, 76 L.Ed. 356 (1932). See also United States v. Davila, 698 F.2d 715, 721 (5th Cir.1983) (respecting the ability of juries in criminal trials to return not guilty verdicts from impulses ranging from compromise to mistake to leniency) (quoting United States v. Espinoza-Cerpa, 630 F.2d 328 (5th Cir.1980)); United States v. Upshaw, 685 F.2d 1202, 1203-1204 (9th Cir.1982) (per curiam) ((1) noting the Supreme Court's caution--in Harris v. Rivera--against inferring too much from apparently inconsistent verdicts, and (2) recognizing that this admonition is especially applicable to jury verdicts in an aiding and abetting case) (citing Harris v. Rivera, 454 U.S. 339, 345-348, 102 S.Ct. 460, 465-466, 70 L.Ed.2d 530 (1981) (per curiam)); Standefer v. United States, 447 U.S. 10, 22-23, 100 S.Ct. 1999, 2007, 64 L.Ed.2d 689 (1980) (explaining the possibilities--in an aiding and abetting case concerning apparently variant verdicts--that jury acquitted out of compassion or that the government presented different evidence against the alleged confederates).
 
 C. 18 U.S.C. § 3504
 
 28
 (a)(1) Claim
 
 18 U.S.C. § 3504(a)(1) provides:
 
 29
 (a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States--
 
 
 30
 (1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;
 
 And 18 U.S.C. § 3504(b) instructs:
 
 31
 (b) As used in this section "unlawful act" means any act the use of any electronic, mechanical, or other device ... in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto.
 
 
 32
 Assuming Section 3504(a)(1) is applicable, a mere assertion that unlawful surveillance has occurred is enough to trigger the government's obligation to affirm or deny. However, a motion alleging only a "suspicion" of such surveillance, or that the movant has "reason to believe" that someone has eavesdropped on his conversations, does not constitute a positive representation giving rise to the government's obligation to respond. United States v. Tucker, 526 F.2d 279, 281-282 (5th Cir.) (holding that, while a defendant's mere assertion of unlawful surveillance is enough to trigger government's obligation to affirm or deny, such assertion must be at minimum a positive statement that unlawful surveillance has taken place--i.e., a generalized motion based on the possibility of such surveillance is not such a claim; and emphasizing that, "the district court retains wide latitude to strike the necessary balance between due regard for a defendant's constitutional rights and the right of the United States to proceed with reasonable promptness in its investigations and prosecutions."), cert. denied, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976). See also United States v. Rubin, 559 F.2d 975, 989 (5th Cir.1977), vacated on other grounds, 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978). Robins argues that the district court erred in not satisfying his pretrial motion under 18 U.S.C. § 3504(a)(1) by ordering the government to affirm or deny the existence of electronic surveillance through Robins' residential telephone.
 
 
 33
 Robins' Section 3504 motion was based on the work of J.P. Hand--a technical expert in detecting unauthorized wiretaps--who had examined the telephone lines at Robins' residence and generated a report respecting his findings and conclusions. Robins' motion stated that "Mr. Hand's several hour examination on November 17, 1990 resulted in his conclusion that a wire tap had been connected to the residential telephone line of the defendant." But the actual conclusion of Hand's attached report expressed an equivocal suspicion rather than a positive statement:
 
 
 34
 The physical evidence observed along General Telephone Company's line 303 in rural Van Zant [sic ] county is, in the opinion of this Investigator, (and I have had several years experience in detecting unauthorized type wire taps), consistent with what I would suspect could have been made by some one [sic ] connecting an unauthorized wire tap on ... the residential telephone line of Mr. Gene Robbins [sic ].
 
 
 35
 Record Vol. 2 at 352 (emphasis added). The government responded that Robins had "made no allegation of illegal electronic surveillance sufficient to require a response by the government pursuant to 18 U.S.C. § 3504." Record Vol. 2 at 358. In essence, the government argued that the motion and report upon which it rested amounted to but a generalized motion based on the possibility that unlawful surveillance of Robins took place, and did not equal the necessary unequivocal assertion that unlawful surveillance had occurred. See United States v. Tucker, 526 F.2d 279 (5th Cir.), cert. denied, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976). The district court granted Robins' motion "to the extent required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); 18 U.S.C. § 3500; and Fed.R.Cr.P. 16." The district court also took note of the government's representations that the government had or would make any and all statements of the defendants, including those on video and/or audio tapes, available for the defendants' review. Record Vol. 2 at 581.
 
 
 36
 By its terms, Section 3504(a)(1) does not apply to Robins' case. Robins' pretrial motion did not point to evidence to be used by the government in the prosecution having a causal link to illegal monitoring. 18 U.S.C. § 3504(a)(1) applies only when the defendant claims "evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act." Robins admits that his purpose in seeking disclosure of illegal electronic surveillance was to learn when the government became interested in him as a target for investigation of marijuana-related violations, and whether the government learned of specific conversations involving co-defendants prior to his debriefing. Appellant's Brief at 21. Robins' pretrial motion did not point to any specific statements or other evidence as having been obtained from an unlawful surveillance, and thus the threshold requirement of Section 3504(a)(1) was not crossed. Compare United States v. Williams, 580 F.2d 578 (D.C.Cir.) (to facilitate an accused's effort to demonstrate that evidence employable against him is contaminated by illegal surveillance previously conducted, the government, upon request, must affirm or deny the occurrence of the alleged unlawful act), cert. denied, 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978). See also United States v. Nabors, 707 F.2d 1294, 1302 (11th Cir.1983) (request that court make inquiry to determine whether any evidence was the poisonous fruit of illegal surveillance is insufficient to allege actual monitoring or a causal link between unlawful monitoring and the evidence), cert. denied, 465 U.S. 1021, 104 S.Ct. 1271, 79 L.Ed.2d 677 (1984); In re Dellinger, 357 F.Supp. 949, 961 (N.D.Ill.1973) (18 U.S.C. § 3504(a)(1) not triggered until some showing has been made that a specific item of evidence to be offered by the government would be inadmissible as being illegally derived), aff'd, 502 F.2d 813, 818-819 (7th Cir.1974), cert. denied, 420 U.S. 990, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). The district court did not err in its ruling relative to Robins' Section 3504(a)(1) motion.
 
 
 37
 D. Allegedly Prejudicial Opening Remarks and the District
 
 Court's Handling of the Same
 
 38
 Robins next argues: (1) that he was prejudiced by an opening remark by Co-Defendant Allison's counsel--to the effect that other people who were involved in the crimes charged in the indictment before the jury "were going to testify now because they decided to plead guilty" (Record Vol. 8 at 168); and (2) that this prejudice--given the district court's failure to adequately issue a curative jury instruction respecting the remark--rendered Robins' trial so unfair as to require reversal on both counts upon which Robins was convicted. Robins' counsel made no contemporaneous objection to the opening remark of the co-defendant's counsel. Nonetheless, Robins contends that from this remark the jury could rationally infer that most, if not all of the persons named in the indictment who were not on trial had agreed to plead guilty to the charges in the indictment--and that this inference unfairly festered in the dimness or dark of the district court's instructional inaction to the point of poisoning Robins' whole trial.
 
 
 39
 Under the circumstances of this case, the district court's instructions to the jury were sufficient to cure any prejudice that might have inhered in the opening remark of Co-Defendant Allison's counsel. Before opening statements were made, the district court more than once instructed the jurors that each defendant was to receive their separate consideration. Record Vol. 7 at 132-133. For example, the trial court told the jury:
 
 
 40
 [E]ach defendant is entitled to your separate consideration. Do not think of the defendants as a group. * * * Just as the indictment is not evidence, neither is the opening statement evidence. * * * Keep in mind after opening statements have been presented ... that no evidence at that time will have been offered by anybody.
 
 
 41
 Record Vol. 7 at 132-133. And the district court's jury charge at the end of trial included a forceful instruction that the testimony of an alleged accomplice, "and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication, must always be examined and weighed by you with greater care and caution than the testimony of ordinary witnesses." Record Vol. 3 at 638. The district court's charge also admonished the jury that "[t]he fact that an accomplice has entered a plea of guilty to an offense charged is not evidence, in and of itself, of the guilt of any other person." Id.
 
 
 42
 This is not a case in which a co-defendant's plea was introduced in evidence. Still, it is enlightening to examine the factors for consideration in determining whether introduction in evidence of a co-defendant's plea improperly prejudiced the defendant. The balance of these factors cuts against Robins' argument about the prejudice inhering in the opening statements of his co-defendant's counsel. In this Circuit:
 
 
 43
 Factors to be considered in evaluating the impact of a witness' guilty plea are the presence or absence of a limiting instruction, whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, and whether the introduction of the plea was invited by defense counsel.
 
 
 44
 United States v. Black, 685 F.2d 132, 135 (5th Cir.), cert. denied, 459 U.S. 1021, 103 S.Ct. 387, 74 L.Ed.2d 518 (1982) (citing United States v. Fleetwood, 528 F.2d 528, 532 (5th Cir.1976)).
 
 
 45
 It is obvious that Co-Defendant Allison's counsel, through his opening remarks, was inviting the jury to regard with suspicion any adverse testimony by one of the plea bargaining testifiers. Compare United States v. Casto, 889 F.2d 562, 567 (5th Cir.1989), cert. denied, 493 U.S. 1092, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990). And the brevity of the reference to the unnamed plea bargained accomplices who were going to testify is an important analytical factor. So is the fact that the remark came immediately after a cautionary instruction from the court that such remarks were not evidence of any of the trial defendants' guilt. Most importantly, the jury was given a clear, strong cautionary instruction in the court's charge. Compare United States v. Black, supra, at 135.
 
 
 46
 In sum: the rights of Robins were not substantially implicated, let alone truncated by the opening remark of his co-defendant's counsel. Compare United States v. Mattoni, 698 F.2d 691, 694 (5th Cir.1983) (defendant's rights not substantially implicated by introduction in evidence of co-defendant's guilty plea--because limiting instruction was given; and the instruction was combined with factors such as a lack of undue emphasis or attempted use of the plea as substantive evidence of guilt of the defendant).[1] Moreover, even if some error could be regarded as inhering in the opening remark, such error must be held harmless; it simply could not be deemed so highly prejudicial as to have been incurable by the trial court's admonitions. Given the wealth of evidence regarding Robins' guilt, we are convinced that the remark could not have had a substantial impact on the jury's verdict. Compare United States v. Klein, 546 F.2d 1259, 1263 (5th Cir.1977), and authorities cited therein (prejudicial remarks amount to reversible error only if there exists a "significant possibility that they had a substantial impact on the jury's verdict.").
 
 E. Alleged Sentencing Errors
 
 47
 Robins' final point is that the district court erred in concluding that the base offense level under the United States Sentencing Guidelines (U.S.S.G. or Guidelines) applicable to Robins was 38, and thus, that the district court erred in sentencing Robins within the range of punishment prescribed by that base offense level. Specifically, Robins asserts: (1) that the amounts of marijuana ascribed to him prior to 1987 by the district court were not in fact part of the same course of conduct or part of a common scheme or plan as the counts upon which he was convicted--as is required by Section 1B1.3(a)(2) of the Guidelines; and (2) that the bulk of the marijuana the district court found to have been distributed by him prior to 1987 was extrapolated from financial records unlawfully seized from his residence. Again we disagree with Appellant.
 
 1. Relevant Conduct
 
 48
 Under U.S.S.G. § 2D1.4, "[i]f a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed." In a drug conspiracy case, quantities and types of drugs not specified in the count of conviction are to be grouped in determining the offense level--if they were part of the same course of conduct or common scheme or plan as the offense of conviction. U.S.S.G. § 3D1.2(d), Commentary. And where the amount seized does not reflect the scale of the offense, the sentencing court must approximate the quantity of the controlled substance. In so approximating, the court may consider, for example, the price generally obtained for the controlled substance, financial and other records, and similar transactions in controlled substances by the convict. U.S.S.G. § 2D1.4, Application Note 2. See United States v. Thomas, 870 F.2d 174, 176 (5th Cir.1989) (district court may consider a variety of evidence in this respect--not limited to amounts seized or specified in the indictment).
 
 
 49
 The clearly erroneous standard applies to the factual determination of what quantity of drugs is implicated by the crime under consideration by the sentencing court. See e.g. United States v. Thomas, 870 F.2d 174, 176 (5th Cir.1989). Due deference is afforded to the district court's application of the Sentencing Guidelines to the facts it finds. United States v. Parks, 924 F.2d 68, 71 (5th Cir.1991). Additionally, a presentence report generally bears sufficient indicia of reliability to be considered as evidence by the trial court in making the factual determinations required by the Guidelines. And it is proper for the district court to rely on a presentence report's construction of evidence to resolve a factual dispute, rather than relying on the defendant's version of the facts. United States v. Alfaro, 919 F.2d 962, 966 (5th Cir.1990) (citing United States v. Murillo, 902 F.2d 1169, 1173 (5th Cir.1990)).
 
 
 50
 The presentence report (Report) relied on by the district court in this case contained the estimate of federal agents that from 1984 to 1989, the Robins organization distributed approximately 200,000 to 250,000 pounds of marijuana. The Report stated that the agents' estimate was based on an analysis of drug ledgers, interviews with co-defendants, as well as admissions from Robins. The Report advised that 200,000 pounds of marijuana translates to 90,720 kilograms of marijuana. And the Report determined that the base offense level under U.S.S.G. § 2D1.1 was 38 (based on at least 30,000 kilograms but less than 100,000 kilograms of marijuana).
 
 
 51
 Robins objected to the Report's quantitative estimate by arguing that specific trial testimony was to less than 6,500 pounds of marijuana and was limited to the time period from mid-1988 to late 1989. Robins denied he was involved with the distribution of marijuana for a period of at least 18 months prior to mid-1988 and thus, he asserted, any alleged quantities of marijuana prior to 1987 were not part of the same course conduct or part of a common scheme or plan as the count of conviction--and so any such quantity should not be considered. That is, Robins argued that the base offense level should be calculated on less than 6,500 pounds of marijuana, which would amount to, at most, a base level of 32. Record Vol. 3, at 754-755, 758.
 
 
 52
 At the sentencing hearing, the district court discussed various authorities, and concluded that it would rely on: "information that is in the Presentence Report in this case, together with any other reliable information that is presented to me or that is in the record such as affidavits in support of search warrants." Record Vol. 17 at 1377-1383, 1383. The district court recognized Robins was arguing that a hiatus of approximately one and one half years rendered prior conduct irrelevant. But the court concluded that even assuming this hiatus occurred, it was inadequate in duration to make the previous conduct irrelevant for sentencing purposes. Record Vol. 17 at 1384-1385. The district court heard testimony from Special Agent Timothy Stover about Robins' income and activities. Record Vol. 17 at 1400-1446. Among other things, the agent testified concerning drug activities in 1981 in Florida by a person known as Jim Roberts, who was actually Milton Eugene Robins. The agent testified that during an interview with one of Appellant's associates, Philip Robins, Philip quoted Eugene Robins as saying he made a million to a million and one half dollars the previous year in the marijuana business, and that the Robins organization transported currency to Hong Kong over a three year period--laundering an estimated 1.7 million dollars (Record Vol. 17 at 1400-1408). Agent Stover said that ledgers found at Robins' residence pursuant to a search warrant issued June 1, 1990 showed receipts from February of 1985 to February of 1986 of approximately $17,000,000 (computed at $495 per pound of marijuana (Record Vol. 17 at 1409)) and that other records showed the activity continued in 1986. Stover also told the court that confederates of Eugene Robins'--Phillip Robins and Nona Harris--indicated to Stover that 1986 was one of the Robins organization's "peak" years. Record Vol. 17 at 1410.
 
 
 53
 In brief: the evidence showed Robins carried on a large-scale marijuana trafficking business for a number of years. The amount of marijuana involved in the 1989 transactions simply did not reflect the full scale of Robins' conspiracy conviction. Accordingly, similar transactions were appropriately considered by the district court in calculating the applicable quantity of marijuana for sentencing purposes. Upon considering all the evidence, testimony and arguments before it, the district court calculated that the amount at issue was 80,000 pounds divided by 2.2--i.e., an amount in excess of 30,000 kilograms but less than 100,000 kilograms, which fell within the range producing a base offense level of 38 under the Guidelines. Record Vol. 17 at 1470. The findings and computations of the district court were not clearly erroneous or unreliable. The district court did not err in setting Robins' base offense level at 38.
 
 
 54
 2. Seized Financial Records as Sentencing Information
 
 
 55
 Robins contests the propriety of the district court's consideration of documents seized from his residence. Robins argues these documents were obtained in violation of his Fourth Amendment rights. He contends the affidavit upon which the search warrant was issued failed to state probable cause, in that it displayed an insufficient nexus connecting the criminal activity and his residence and contained information that was stale. Robins' arguments are unpersuasive, for the following reasons.
 
 
 56
 First, "[d]espite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). It is a fundamental principle of sentencing that a district court may conduct an inquiry broad in scope, largely unlimited either as to the kind of information it may consider, or the source from which such information may come. United States v. Campbell, 684 F.2d 141, 152 (D.C.Cir.1982). The exclusionary rule applicable to Fourth Amendment violations is generally inapplicable to the district court's consideration of evidence for purposes of sentencing. See United States v. Butler, 680 F.2d 1055, 1056 (5th Cir.1982). See also United States v. McCrory, 930 F.2d 63, 67-69 (D.C.Cir.1991) (under the circumstances, exclusionary rule not a bar to the use of illegally obtained evidence in order to calculate the base offense level under the Guidelines), cert. denied, --- U.S. ----, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992); United States v. Torres, 926 F.2d 321, 325 (3rd Cir.1991) (evidence suppressed at trial for violation of Fourth Amendment may be considered in determining base offense level under the Guidelines).
 
 
 57
 In Robins' Pro Se Supplemental Brief, he argues that his case falls within the fundamental fairness exception to this general rule--specifically as delineated in the Ninth Circuit's 1968 case, Verdugo v. United States, 402 F.2d 599 (9th Cir.1968), cert. denied, 402 U.S. 961, 91 S.Ct. 1623, 29 L.Ed.2d 124 (1971). See also United States v. Campbell, supra, at 153, and authorities cited therein ("it is also fundamental that some limitation on the range of permissible sentencing considerations is required by the constitutional guarantee of due process") (emphasis in original). However, Robins' case is easily distinguishable from Verdugo and its kin.
 
 
 58
 As Judge Alvin Rubin succinctly recognized: "[t]he Verdugo court did not ... lay down a blanket rule ...; rather, it required a case-by-case weighing of the potential deterrent effect on police misconduct." United States v. Butler, 680 F.2d 1055, 1056 (5th Cir.1982). In Verdugo:
 
 
 59
 the search was blatantly unconstitutional and one count of the two-count indictment was dismissed once the motion to suppress was granted. The court distinguished an earlier case in which resentencing was not required because there was admissible evidence, independently adduced, on the same facts. The court also noted that any deterrent effect from use of the exclusionary rule at sentencing would be minimal if a conviction were obtained without the evidence suppressed.
 
 
 60
 Butler, id. Indeed, the Ninth Circuit later held that a trial judge did not abuse his discretion in considering for sentencing purposes evidence suppressed at trial due to a technical flaw in a search warrant's underlying affidavit. United States v. Larios, 640 F.2d 938, 941-942 (9th Cir.1981). The policy reasons for this are sound, as well-illuminated in this Circuit's Butler opinion. See Butler, 680 F.2d at 1056. See also United States v. Jessup, 966 F.2d 1354, 1356-1357 (10th Cir.1992) (recognizing the significant limitations of the Verdugo decision: "the Ninth Circuit has since cautioned that the Verdugo holding has a narrow scope and requires exclusion only when the use of illegally seized evidence provides a substantial incentive for illegal searches.") (citing United States v. Vandemark, 522 F.2d 1019, 1022-1025 (9th Cir.1975)). In Robins' case, there was admissible evidence--i.e., adduced independently of the search at issue--on the essential sentencing facts considered by the district court. And the evidence about which Robins complains was not suppressed at trial yet used at sentencing.
 
 
 61
 Most importantly though, the sentencing evidence about which Robins complains was not illegally obtained. An affidavit prepared and submitted in support of a search warrant generally bears sufficient indicia of reliability. United States v. Alfaro, 919 F.2d 962, 966 (5th Cir.1990). And the May 31, 1990 affidavit of Detective Sandy Soule of the Drug Enforcement Agency (DEA)/Dallas Police Task Force--supporting issuance of the warrant to search Robins' residence--falls well within this normal fold. In light of the proper standard of this Court's review, at least, there existed sufficient nexus between the criminal activity alleged and Robins' residence to establish probable cause for the issuance of the warrant to search Robins' residence.[2]
 
 
 62
 A nexus between the place to be searched and the items to be seized may be established through direct observation or through normal inferences. See United States v. McKinney, 758 F.2d 1036, 1043 (5th Cir.1985). A residence is a quite convenient, commonly-used place for planning continuing criminal activities like large-scale marijuana trafficking and money laundering conspiracies. There was undoubtedly an adequate nexus, between Robins' residence and Detective Soule's allegations to the Magistrate Judge about Robins' marijuana operation, to support the search warrant for the marijuana and related records Detective Soule's experience and common sense told him would likely be at Robins' residence. See generally United States v. Green, 634 F.2d 222, 226 (5th Cir.1981); accord United States v. Pace, 955 F.2d 270, 277-278 (5th Cir.1992).
 
 
 63
 This answers the staleness question too. United States v. Craig, 861 F.2d 818, 820-823 (5th Cir.1988) (a staleness issue may be resolved where the affidavit has sufficient indicia of probable cause to make it possible for the officers to believe, objectively and reasonably, in the validity of the warrant). Still, we think it important to emphasize that "staleness is an issue which must be decided on the peculiar facts of each case, and that a mechanical count of days is of little assistance in this determination." United States v. Hyde, 574 F.2d 856, 865 (5th Cir.1978). Fairly long periods of time are allowed to elapse between information and a search warrant in cases where the evidence clearly shows--as it did in this case--a longstanding, on-going pattern of criminal activity. Id.
 
 III. Conclusion
 
 64
 For the foregoing reasons, we affirm the district court on every point raised in this appeal.
 
 
 
 *
 Chief Judge of the Eastern District of Texas, sitting by designation
 
 
 [1]
 The instruction given by the district court in Robins' case was the one approved in Mattoni. 698 F.2d at 694
 
 
 [2]
 It is fundamental that probable cause involves a practical, common sense determination by a neutral judicial officer as to whether the information provided represents a basis for believing a warrant should issue. United States v. Pace, 955 F.2d 270, 277-278 (5th Cir.1992). And the determination by a United States Magistrate Judge that an affidavit supporting a search warrant establishes probable cause is entitled to great deference by the reviewing court. United States v. May, 819 F.2d 531, 535 (5th Cir.1987) (citing inter alia Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983))